PETER THALLHIMER, plaintiff in error,
*against*
GEORGE BRINCKERHOFF, defendant in error.

*H. T.*, who claimed land as heir at law of his father, and who was about
to commence suits to recover the possession of it, entered into an agree-
ment with the plaintiff, who had married his sister, by which he cove-
nanted in consideration of the premises, &c. to convey to the plaintiff
the one fourth part of the property which should be recovered; and
the plaintiff, in consideration of such covenant, &c. promised *H. T.* to
pay, bear and sustain the one half of all the expenses which might occur

---

*Margin notes:*

ALBANY,
April, 1824.

Thallhimer
v.
Brinckerhoff.

Whether con-
fession of a
corporator is e-
vidence against
a corporation.

ALBANY,
April, 1824.

Thallhimer
v.
Brinckerhoff.

in the prosecution of the intended suits, &c; The defendant who drew the agreement, and subcribed it as a witness, as attorney of *H. T.*, and the plaintiff brought actions of ejectment against the persons in possession of the land ; and afterwards, by virtue of a power of attorney from *H. T.*, for that purpose, but without the knowledge of the plaintiff, compromised with the tenants, and received from them a large sum of money;

In an action of assumpsit for money had and received to the use of the plaintiff, brought by him to recover one fourth part of the money so received by the defendant : *held*, that the agreement between the plaintiff and *H. T.* was valid, and not illegal and void within the provisions of the act to prevent and punish champetry and maintenance, (*sess.* 24, *ch.* 87, 1 *R. L.* 172) and that the plaintiff could, therefore, recover against the defendant.

Held, also, that general *indebitatus assumpsit* for money had and received was the proper form of action.

Held, also, that the non-joinder of *H. T.* was no objection.

History of the law in relation to champerty, maintenance and barratry.

It was a principle of the common law that a chose in action could not be transferred ; but this is now reversed ; though at this day a part of a chose in action cannot be transferred.

The common law rule never prevailed in Courts of Equity.

To maintain the suit of another, is unlawful, unless the person maintaining has some interest, in the subject of the suit, distinct from what he may acquire by the agreement to maintain, or is connected with the suitor in some social relation ; but where one has such an interest, whether it be great or small, vested or contingent, certain or uncertain, he may maintain. So where there is consanguinity or affinity between the suitor and him who gives aid to the suit, the latter may maintain.

The relation of landlord and tenant, master and servant, acts of charity to the poor, and the exercise of the legal profession, are also cases in which it is not unlawful to maintain.

The laws against champetry, &c. were intended to prevent the interference of strangers, having no pretence of right in the subject of the suit, and standing in no relation of duty to the suitor.

The above rules and exceptions extend both to champerty and maintenance ; the latter being the generic term, including champerty, which is maintenance in a particular form, viz. upon a contract to divide the subject of the suit.

A husband whose wife may, by possibility, be heir of one who claims land, may maintain the suit of the claimant, brought to recover the land, upon an agreement to have part of the land.

Error from the Supreme Court, upon a bill of exceptions. Judgment was rendered for the defendant below, who was also the defendant in this Court, upon facts which are, to every material purpose, detailed in the report of the

same cause, as it came before the Supreme Court, (20 *John. Rep.* 386) in *January* term, 1823.

*S. G. Huntington*, for the plaintiff in error.

1. The agreement between *Teller* and the plaintiff was legal and binding upon the parties. The objection is, that the plaintiff was guilty of maintenance or champerty, by the act of entering into it, and that it is, therefore, void. Maintenance is defined to be an officious intermeddling in a suit that no way belongs to one, by maintaining or assisting either party with money or otherwise, to the disturbance of the community, by stirring up suits. (4 *Bl. Com.* 134, 135. 3 *Burn. J.* 116. 2 *Chit. C. L.* 233, *note* (a). 5 *Com. Dig.* 16, *Maintenance*, (*A*).) Champerty is a species of maintenance, being a bargain with a plaintiff or defendant to divide the land or other matter sued for, between them, if they prevail at law. (3 *Burn. J.* 116. 4 *Bl. Com.* 134, 135. 2 *Chit. C. L.* 233, *note* (a). 5 *Com. Dig.* 16, *Maintenance*, (*A.* 1, 2). If a man have any interest in the subject of the agreement about which the suit is to be brought or is depending, this is not maintenance, be the interest never so remote. (*Hawk. P. C. B.* 1, *ch.* 83, *s.* 1, 13, 17, 18, 21, 22. *Wickham* v. *Conklin*, 8 *John. Rep.* 220. 3 *Burn. J.* 117. *Bac. Abr. Maintenance*, (*B*).

Here is, we contend, such an interest in the plaintiff as legally entitled him to make this arrangement. *Teller* admitted, by his agreement, under seal, that the plaintiff intermarried with his sister, and had an equitable, though not a legal interest in the subject of the agreement ; that this interest in the plaintiff was a consequence of the marriage. No such interest could have been communicated, unless there had been, at least, an equitable one in the wife. Our case, then, is made out by the agreement itself, which must be taken as conclusive between the parties, and upon all claiming under them. (1 *Phil. Ev.* 355, 2d *Am. ed.*)

The plaintiff, then, having an interest, all the authorities agree that he may maintain the action. The extent of the interest is no where made the criterion. (2 *Rol. Abr.* 115. *Bro. Abr. Maintenance*, *pl.* 7, 14, 17.) Nor is it necessary

ALBANY,
April. 1824.

Thallhimer
v.
Brinckerhoff.

that the interest should be vested or certain—a contingent interest is enough. (2 *Rol. Abr.* 117. 1 *Hawk. P. C. B.* 1, ch. 83, s. 13, 14.)

The case states that *Thallhimer* married *the* sister, not *a* sister of *Teller*, thus implying, in terms, that she was his only sister ; nor is there evidence that he had any other. He having no children, (and it is not shown that he had any) she was the next heir. Being the next heir, or one of the next heirs, her husband had a clear right to contract. Indeed, a mere possibility of future interest is enough. (15 *Vin.* 162, *Maintenance*, (*H*). 1 *Hawk. B.* 1, ch. 83, s. 13, 14. *id.* ch. 84, s. 19. *Bro. Maintenance*, 15, 18. 1 *Bac. Abr.* 576, tit. *Champerty.* 2 *Inst.* 563-4.)

2. But if the agreement were illegal, the defendant cannot take advantage of it. *Teller*, having acted under the agreement, has no right to object ; and if so with him, it is the same with the defendant, who acts under him, and is bound by the relation of attorney. He can do nothing except what *Teller* authorizes him to do. Suppose that, at the Circuit, the defendant's counsel had set up the statute of limitations, but the defendant himself had risen and told them to waive this, and declined all advantage from it ; would not the counsel have been bound by his acts ? Certainly. To defend upon such ground, they must maintain an authority to do it, derived from their client. So with the defendant here. He should have shewn that his client authorized him to withhold from us our just due upon the agreement ; that *Teller* objects to our recovery, and authorizes him to do so. He, for aught that appears, is willing that we should have the full benefit of the arrangement. There is no evidence that *Brinckerhoff* ever settled with him. The inference, in the absence of proof to the contrary, is, that he is perfectly willing to do us justice.

3. The money received by the defendant was, as to one fourth part, received by him to the use of the plaintiff.

*H. Bleecker & A. Van Vechten*, for the defendant in error, made the following points ᴺ 1. That *Henry R. Teller* should have been joined with the plaintiff in the action. (*Ziele* v.

*Exrs. of Campbell*, 2 *John. Cas.* 382.) 2. An action of assumpsit cannot be sustained for the money claimed by the plaintiff, because, by the agreement between *Teller* and him, the plaintiff was to have one fourth of the land, not the money received for it. The *casus fœderis* between the parties never occurred. 3. The agreement was void, within the statute to prevent champerty and maintenance, and the plaintiff can derive no right of action from it against the defendant. 4. The plaintiff ought to have proved notice to the defendant, to pay the proportion of the money claimed.

It is true, the 1st, 2d and 3d points were not expressly made at the Circuit ; but we have a right to present them here ; especially those which it is plain could not have been obviated by any additional proof. (*Beekman* v. *Frost*, 18 *John.* 544.) This is clearly so with the objection of the nonjoinder, and the form of the action, being for money instead of the breach of the special agreement. Both of these objections arise from the nature of the transaction.

The third point is the principal one. As to this the defendant was not put upon his defence. It is said, he should have proved this and that ; but the obvious answer is, that he had no chance to prove any thing. The cause was arrested upon the insufficiency of the plaintiff's proof ; and it would be unreasonable to infer any thing against the defendant, for lack of evidence, which the Circuit Judge pronounced to be idle and unnecessary.

The agreement was void. The statute, (1 *R. L.* 172, *s.* 1) provides, that no officer or other person shall take upon him any business that is or may be in suit, to have any part of the thing in plea or demand ; and no person, upon any such agreement, shall give up his right to another ; and every such conveyance or agreement shall be void ; and every person who shall maintain any plea or suit in any Court, for lands, &c. to have part or profit of them, shall be punished by fine and imprisonment ; but this act shall not prohibit any person to have counsel of persons duly licensed, or of his parents and next friends. We rely upon these provisions. The other sections of the statute provide against buying titles, and simple maintenance. The latter is mere-

ly aiding another in a suit.   Champerty is where a man
agrees to maintain the suit, upon condition to have part of
the thing in dispute.   This was the view taken of the sub-
ject in *Jackson* v. *Ketchum*, (8 *John. Rep.* 479.)   The Court
say, the established doctrine is, that a purchase, or even
gift of the land, while a suit is pending concerning it, if it
be made with a knowledge of the suit, and be not the con-
summation of a previous bargain, nor founded on the ties of
blood, is within the purview of the statute.   An agreement,
in contemplation of a suit, is equally void as if it had been
the consummation of a contract founded in maintenance.
This is obvious from the words of the statute, as cited and
commented upon in the last case.   If the agreement relate
to what is or *may be* in suit, it is void.   The Court adopt
the ancient doctrine, in its full extent, and say that our stat-
ute is even more explicit, in avoiding the agreement, than
the old ones, of which it is a transcript.   (*West.* 1, *ch.* 25,
28, 49, *and* 28 *Ed.* 1, *ch.* 11.)

It was said, in the Court below, that here was no adverse
possession ; but this is immaterial.   Even if *Teller* had been
in possession himself, a defendant in ejectment, or expecting
to be a defendant, it is plain, from *Jackson* v. *Ketchum*, the
agreement would have been void, as an act of champerty.
The statute forbids one taking upon himself any thing in
plea or demand ; and the present is the very case within its
contemplation and its terms.   You could not illustrate the
offence in plainer and stronger language than is presented by
the bill of exceptions.   The agreement looks to an adverse
possession, if this were necessary.   Suits were to be brought
for the purpose of getting into possession.   These would
have been unnecessary had there been no adverse possess-
ors of the land.   Had the possession been in acknowledged
subserviency to *Teller's* title, there would have been no sha-
ring of expense in order to vindicate the right.   But, we re-
peat, it is enough that the busines was, or might be in suit,
and that the plaintiff was to have a part of the thing in de-
mand.   No explanation, however, was offered, to take the
case out of the statute·   If adverse possession be an ingre-
dient of the offence, why was it not negatived by proof at

the trial? If suits for the recovery were not necessary, why was this not shewn?

All that has been set up in vindication of the agreement is, that the plaintiff intermarried with the sister of *Teller*, and thus acquired an equitable interest. It is true, that a certain interest would take the case out of the 9th section of the statute, which relates not to champerty, but maintenance. But even if this be holden maintenance, here is no such interest as will form an exception. *Wickham q. t.* v. *Conklin*, (8 *John. Rep.* 220) cited on the other side, was a case of mere maintenance; and an exception was allowed. This was on the ground that the defendant, *Conklin*, was a *cestuy que trust* of the land in dispute, and prosecuted for his own benefit. He had a plain, defineable, equitable, subsisting interest, which might be enforced. Not so here. *Thallhimer* had no right but what he was to acquire by force of the agreement itself. It is said, this admits the wife's interest. Not so. It admits the facts stated in it; and these show no interest whatever. Does an admission that *A* is the sister of *B* shew her to be his heir? The amount of the admission in the agreement is, that she had a just right, not equitable. Had it stated an equitable right as the consequence of the relation, the conclusion would have been false. How could Mrs. *Thallhimer* ever have enforced a right growing out of these circumstances? *Teller* is admitted to be the heir at law. It appears his father died before the statute of descents, and he was the sole heir, being the eldest son. A Court of Equity could not assist her. The interest is altogether ideal and intangible. The right to real estate is settled by the law, and there can be no right not founded on this basis. The law can draw no conclusion of right from such premises as are stated here, and the inference sought for has nothing to support it. Suppose a man attempts to devise land by an instrument attested by two witnesses only; could it be pretended, that the devisee had any equitable or legal right? His friends might think so, but the law would treat him as a perfect stranger. (2 *Bl. Com.* 13.) It would never allow an exception which could be satisfied by the mere fancy of the claimant, but refers to such

ALBANY,
April, 1824.

Thallhimer
v.
Brinckerhoff.

an interest, only, as itself would recognize and enforce ; oth-
erwise its provisions might be evaded at pleasure.    If Mrs.
*Thallhimer* had such a right as the law acknowledges, on the
ground taken, that she might possibly inherit, uncles, cousins,
&c. come within the same rule.    All the relations may pos-
sibly inherit.    Would this remote chance entitle them to
bring suits for the land ?    A defendant may thus lie at the
mercy of a whole community of relations, bringing suits up-
on an agreement to divide the spoil.    Indeed, the moment
you go beyond the heir, you launch beyond all rule, and vir-
tually repeal the statute.    Then if the interest does not
take the case out of the statute of maintenance, (the 9th sec-
tion) *a fortiori* it will not out of the statute of champerty,
(the 1st section.)

Does the case come within the exception in favour of li-
censed counsel, or parents, or next friends ? (1 *R. L.* 172,
*s.* 1.)    Does taking counsel excuse the buying and selling,
or contracting to have part of the thing in dispute ? The
enacting clause prohibits this to all, including counsel and
friends.    Among all the authorities cited, there is but one
which mentions an exception in the case of champerty,
where the thing may be conveyed.    That is 1 *Hawk. B.* 1
*ch.* 84, *s.* 19.    This was cited and relied on by his honor
Judge *Woodworth*, who dissented from the Court below. (20
*John. Rep.* 401.)    And if this be law, it is against the plain
terms of the act.    *Hawkins* is writing under the general head
of maintenance, of which he treats champerty as a subdivi-
sion ; and this section 19 is the only one in which he has
mentioned such an exception under this head.    He cites
Ld. *Coke*, and all that he says is taken from the *Year Books*.
The two offences of champerty and maintenance may have
been confounded in this single instance ; for certainly other
authorities are plainly to the contrary.    It has been repea-
tedly decided under the English statute, that even attornies
or counsel cannot agree to have part of the thing about
which they are litigating as a compensation for their servi-
ces ; and why not so as to a next friend.    Indeed his advice
must always be entirely gratuitous.    He cannot take fees.
Why not the same in one case as in the other, as to sharing

ALBANY,
April, 1824.

Thallhimer
v.
Brinckerhoff.

the spoil? Both are placed on the same footing by the statute of maintenance, and both are, in terms, shut out by the statute of champerty. The exception cannot be extended by construction. But, most likely, when *Hawkins* makes this exception of the son, he must mean the heir. Thus the 2 *Inst.* 564, upon which he relies, says, " In like manner, and by the like reason, if the father be demandant in a *præcipe*, he may promise and contract with the son to secure him the land after the recovery, and is not any champerty within this act, and *so of any other ancestor and his heir apparent.*" It is plain that *Coke* means *heir*, or why should he add, " so of any other ancestor, or heir apparent ?" In *ch.* 88, *s.* 13 & 14, *Hawkins* speaks first of remaindermen and reversioners, having a vested interest ; or an interest which it is in no man's power to deprive them of ; and he concludes, " therefore, an heir apparent, or the husband of such heir may maintain the ancestor." Is it not fair to conclude that here, also, when he speaks of an heir, he means one who has a vested interest as heir ? The Chief Justice who delivered the opinion of the Court below, understands Lord *Coke* to mean, merely, that the pendency of a suit shall not prevent a father making provision for his son out of the thing in demand.

If the exception be not limited to the heir apparent or presumptive, we ask, again, where are you to stop ? The whole range of kindred may maintain suits with impunity. To whom did it belong to shew that Mrs. *Thallhimer* was heir apparent or presumptive ? It does not follow from her being the sister of *Teller.* The agreement does not make out even this plausible case. For aught that appears, other persons were heirs of *Teller.* One fourth is to be conveyed ; but how does it appear that *Thallhimer* had an interest in this, or any other portion ? We mention this to shew that the estimate of interest was merely arbitrary ; that the sister had no real interest. When the heir is allowed to maintain, this relates to the subject of his immediate expectancy or descent. If Mrs. *Thallhimer* had any interest, instead of being promoted, it was cut off by the agreement. The land would have gone to her ; but this agreement turns it over

ALBANY,
April, 1824

Thallhimer
v.
Brinckerhoff.

absolutely to her husband, leaving her a mere contingent interest in one third of this fourth, as dowager. It is evident that all this language, relating to her interest, was inserted in the agreement colorably to avoid the statute. All the authorities cited against us, perhaps with the single exception we have mentioned, relate to maintenance. The 1 *Hawk. ch.* 83, *s.* 20, says, " one cannot justify laying out his own money in the cause, unless he be either father, or son, or heir apparent to the party, or the husband of such an heiress ;" though the same section agrees, that a remote relation may stand by and counsel at the bar. This is, to the same effect as the 14th section of that chapter. It is said that a contingent interest is enough. What this contingent interest must be, will appear from sections 13 and 14 of the same chapter. The contingency must be such as is settled and fixed, when the event happens ; and the heir, alone, is an exception to this rule. True, it is said, in 15 *Vin.* 162, (*H*) *pl.* 9, that a brother may maintain, but the reason is given, viz. because he is heir presumptive. Accordingly, the same book says, a brother of the half blood cannot, because there is no immediate possibility of his inheriting. (*id.*) The distinction between an heir apparent and presumptive will be found in 2 *Bl. Com.* 208. The authorities in 15 *Vin. Abr.* 168, (*O*) *pl.* 9, and *Br. Maintenance, pl.* 18, *p.* 74, and elsewhere, must be understood in reference to one of these heirs, when they say that the husband of a cousin who may be heir has a right to maintain. This relates to a cousin who is heir presumptive. Could a father maintain the suit of his son-in-law ? Beside, these cases mean maintenance properly so called, and as contra-distinguished from champerty. The section quoted by Mr. Justice *Woodworth,* in the Court below, (1 *Hawk. B.* 1 *ch.* 83, *s.* 20) will be seen not to embrace the present case.

The maintenance was not in consideration of the relationship of these parties, but of the land. It was matter of profit on both sides. We deny that even heirs may contract in this manner.

Then, if *Thallimer* had a right to maintain within the authorities, they will not justify him in this act of champerty ;

and though the Court might not punish him criminally, for thus leaguing to vindicate even a fancied right of his own or his wife's, they will declare the agreement void.

We may be told in the language of *Buller*, J. in *Master* v. *Miller*, (4 *T. R.* 340) that our doctrine is harsh ; but this is a subject for the legislature. The language there does not apply. It related to an assignment of a chose in action, and the question was of maintenance, not champerty.

It is said the right to object does not lie with the defendant ; but we answer, the agreeement is void within the express terms of a statute ; and being so, it is as no agreement. Even a party may make the objection. *Teller* himself might do so ; and, *a fortiori*, his agent. The ground and policy of the objection is, that the agreement is unlawful and criminal, and even if *Teller* has consented that the defendant should hold the money to the plaintiff's use, this will not legitimate the transaction, and render that good which was corrupt and void in the beginning. This would enable the parties to repeal a statute. That the defendant may object, we cite *Whitaker* v. *Cone*, (2 *John. Cas.* 58,) *Belding* v. *Pitkin*, (2 *Caines' Rep.* 147,) and *Hunt* v. *Knickerbacker*, (5 *John. Rep.* 327.) It is clear that the plaintiff could never have recovered the land. Then how can he recover the money ? In addition to the authorities already cited to this point, and which were referred to by the Chief Justice in the Court below, we rely on *Biggs* v. *Lawrence*, (3 *T. R.* 454 ;) *Clugas* v. *Penaluna*, (4 *id.* 466 ;) *Morck* v. *Abel*, (3 *B. & P.* 35.) No act or contract in contravention of law can be made the foundation of an action.

*S. Jones*, in reply. I stand here to vindicate a contract made in perfect good faith, with a professional gentleman, the legal agent of the plaintiff; and which has been acted under for a number of years. He was the common attorney of *Teller* and *Thallhimer* ; as such he has received their money respectively. He claims to withhold it ; and unless there is some unbending law to which morality itself must yield, I trust we shall recover. The land to be recovered

ALBANY,
April, 1824.

Thallhimer
v.
Brinckerhoff.

belonged to the common ancestor of *Teller* and his sister ; and both had a fair and equitable right to it. It is true that *Teller* might have maintained the action alone ; but in the prosecution of the contemplated suits, the names of all the ancestor's children might also have been used. Instead of taking either course, money was received for the land expected to be obtained. We affi m the transaction, put ourselves upon the Court and jury, and shew a plain right, unless the agreement is impeachable upon the ground of legal invalidity. How does *Brinckerhoff* defend himself? By shewing that he has accounted for the money ? There is no pretence of this. After having acted under the agreement, his counsel object that it is illegal ; and a majority of the Court below have sustained the objection. Convinced that the dissenting Judge was right, we bring our writ of error.

We are met at the threshold by several preliminary objections. One is, that the action should have been in the joint names of *Teller* and *Thallhimer*. But even if they had been partners, and the party, as here, omitted to take advantage of the non-joinder, either in pleading or at the trial, we might have recovered in severalty. This is clearly the rule as to joint defendants, who must plead the non-joinder in abatement ; and it is the same in regard to the plaintiff, where there is a total omission to object. The defendant was properly met by this answer in the Court below. Even if the action should have been joint, on the face of the bill, yet if the objection had been made at the circuit, it might have been obviated. We might have shewn that the defendant had settled with *Teller*, reserving the money for which we sue, in his hands for our use. This would have been a severance. But the parties have separated their rights by the terms of the agreement. *Thallhimer* was to have one fourth—*Teller* three fourths ; and the suit could have been brought in no other form. The action for money had and received is an equitable action, favoured by the Courts ; and not to be defeated by the technical rules applicable to many other actions.

We are also told, that the money was not received in pursuance of the agreement ; that this embraced land only,

and the *casus fœderis* has not occurred. This goes to the merits of the case. If *Teller* could, by a separate power, defeat our agreement, then, it is true, we cannot recover at all. But how is this? Suppose *Teller* had ecovered the land, and afterwards sold it in defiance of our right; if the agreement be valid, should we have no remedy for the money? Will gentlemen deny a position, so well known to the law. that in such a case, the money would be substituted for the land? that we might affirm the sale and recover the money received upon it? The present is that case. By this act of sale. *Teller* is made our debtor. So of *Brinckerhoff* the actual receiver of the money. True, we might have disavowed the act, and proceeded against *Teller* upon the special agreement; but we had, also, a right to affirm it, which we do by prosecuting our action in this form. *Brinckerhoff* is discharged from the claims of *Teller* by our recovery. If he had liens upon the money, this should have been shown. His fair credits would have been allowed.

It is said we were bound to give him notice. Of what? Not to pay the money over to *Teller?* This would have been so provided he had paid it over; which is not pretended. There was no use in giving notice. Had he paid over without this. I admit we should have been driven to our action against *Teller*, the principal.

But all these formal objections were clearly answerable at the trial by other evidence. The case cited from the 18 *Johnson*, therefore, does not bear gentlemen out. It is of an objection which goes to the whole ground of action; and which, on its face, is final, conclusive and unavoidable by any possible explanation.

The only objection taken, was, that the agreement was void. This is fairly before the Court; and I shall proceed to consider it. This agreement recites that *Teller* was heir to the lands described, his intention to sue for their recovery, that the plaintiff intermarried with his sister, who was justly entitled to a part of them, though not legally. Now, were all these recitals true, or does it lie with our own agent, who has acted under them to de-

ALBANY,
April, 1824.

Thallhimer
v.
Brinckerhoff.

clare them false ?   If true, *Thallhimer* had, by the intermarriage, a just right to a part of the land.   It is said, if *Teller* was sole seised, then Mrs. *Thallhimer* could not be entitled in any way ; but is this so ?  Suppose the land held adversely at the death of the ancestor, who made his will devising one fourth to the sister ; but which could not take effect on account of the adverse possession :  would she not be entitled, in the language of every man ?   And would not the heir to whom the right should descend, be a scoundrel for withholding it ?   Might not such a claim be called just ?   And would not its justice be recognized by the law ?   Would an agreement to perfect such a right, by a fair course of litigation, deserve the epithet of injustice or corruption ?   Would it be void in law ?   If so, law is not morality.   We have, I think, presented one case of just right, though without strict legal title.  Suppose others :  that the ancestor had died in possession having made a will which is lost ;  that *Teller* the heir knew this fact ;  but as the document was gone, nothing remained to shew the right :  or suppose the heir at the death bed of his father, who declared, in the hearing of all his children, that he intended his land for them equally ;  or suppose the ancestor died the day before an act passed altering the course of descent from the eldest son to the children in equal moieties, by which the whole descends according to the ancient rights of primogeniture :  the next day, the legislature declare the old rule partial and unjust ;  shall it be penal for parties to use the same language, in either of the cases supposed, and make arrangements to be at a joint expense in the prosecution of such a right, technically belonging to one, but justly to all ?   Here is the last case precisely ;  an honest attempt by *Teller* to carry the provisions of our statute of descents into effect.   He made a law for himself, in order to do an act of justice to his sister.   Having the whole right, and entitled to the several possession, he treats with his brothers and sisters.   The recovery required expense ;  was it right that he should pay the whole ?   No. Accordingly, the sister assumes the proper share of expense, and he puts the whole on the same footing as if it had descended in common.   For aught we know, the same agree-

ment was made with other brothers and sisters of the family. Is this agreement, then, subject to the criticisms which have been made upon it? When you look at an agreement with a view to its construction, you must take it as it is. The strongest consideration must have been that of consanguinity. Why give one fourth of $50,000 for one half of ten or a dozen lawsuits? The distinction attempted to be drawn between the husband and wife is without foundation. In law they are one. We are to intend that the compromise was for less than the value. Would *Teller* have made such an arrangement with a stranger? He would have found men enough who, if the agreement had been lawful, would have assumed the same responsibility for $\frac{1}{10}$ of the land. The rights of primogeniture have been declared unnatural and unjust, by a statute, almost the first which passed after the declaration of independence. The contract was to equalize the land. Does it contravene the law as it stood at the time?

The 1st and 3d sections of the statute of champerty, &c. (1 R. L. 172-3) are relied upon as embracing and avoiding the agreement. If you take the words of the first section, in their broadest sense, and take a case where the bargain turns upon the consideration of having a part of the thing in demand, without any other motive, it might be void. But is this so, if any other motive be mixed with it? To bring the case within a statute so highly penal, must not the agreement be an act founded upon the naked consideration of a part of the thing in demand? Must not maintaining be the sole ground of the part received? If not so, the motive takes away the guilt. What was the evil intended to be remedied? I cannot express this better than was done by Mr. Justice *Woodworth*, who dissented from the judgment below, and I, therefore, refer the Court to what he says, (20 *John. Rep.* 400.) The act was levelled against strangers, not relatives, either by interest or blood. It was aimed against intruders, or, to adopt the language of the old act itself, against impertinent intruders. It never was intended to restrain the son from protecting the father, or the brother from advocating the cause of the brother. I appeal to the

ALBANY,
April, 1824.

Thallhimer
v
Brinckerhoff.

language of Mr. Justice *Buller*, in *Master* v. *Miller*, (4 *T. R.* 340.) " It is curious, (says he) and not altogether useless, to see how the doctrine of maintenance has, from time to time, been received in *Westminster Hall.* At one time, not only he who laid out money to assist another in his cause, but he that, by his friendship or interest, saved him an expense which he would otherwise be put to, was held guilty of maintenance. (*Bró. tit. Maintenance,* 7, 14, 17, &c.) Nay, if he officiously gave evidence, it was maintenance; so that he must have had a subpœna, or suppress the truth. That such doctrine, repugnant to every honest feeling of the human heart, should soon be laid aside, must be expected. Accordingly, a variety of exceptions were soon made; and, amongst others, it was held, that if a person has any interest in the thing in dispute, though on contingency only, he may lawfully maintain an action on it. (2 *Rol. Abr.* 115.)" There may have been some reason, in early times, why these statutes should have been so construed ; for in the reigns when they passed, it was not unusual for Lords to buy up contested claims against each other, or against commons, when at variance with them, with a view to persecute and oppress the farmers of the country, and others. Very soon, however, exceptions were introduced. The first was interest. If you take the strict words, they embrace every one, whether interested or not. Yet this exception was well established soon after the passage of the act. On this head, the series of cases is unbroken ; and when we passed the statute we adopted the exception. The very definition of the offence, which implies an officious intermeddling, and which was the evil intended to be remedied, precludes the operation of the statute. In some of the books the definition is stated to be an officious act of maintenance, not warranted by the interest of the party interfering. In *Wickham* v. *Conklin*, (8 *John. Rep.* 220) this distinction is recognized. The case decides, that one having an interest cannot be guilty of maintenance. Where is the origin of this exception ? There is none in the words of the act ; yet it is universally acknowledged to exist. Upon what authority do gentlemen deny us the right to go beyond the

ALBANY,
April, 1924.

Thallhimer
v.
Brinckerhoff.

words of the act? With what consistency do they deny this, and at the same time admit their exception? It is not confined to maintenance. It extends to champerty. It embraces both offences. You are never guilty of either, when the inducement is to protect your own interest, and the contract is not a naked one to defray expenses, and have a part of the thing in demand. An opposite construction is at war with the strongest principles of human nature. This induced the Courts to make the exception.

The exception founded upon considerations of blood, depends on the mixed principle of interest and affection. A relation may, by possibility, inherit; and we have cited various authorities where this is enough. In 15 *Vin. Abr. Maintenance*, (*H*), it is said, " Some books say, generally, that a man may maintain his blood, (9 *H.* 6, 64;)" that is to say, all who are of kin to him. Again : " So it is of him to whom the land may descend, (19 *E.* 4, 3, *b.*)" And several corresponding instances are put under the same head, (*I*). Reference is made to the *Year books*, whence the doctrine has been handed down to us unimpaired. The distinction in the *Year books* is not in favour af the heir apparent only. It is general, that a parent may maintain for his son; but a brother, of the half blood, cannot maintain his brother. Why? Because he is considered a mere stranger. The exception does not exist as to him, because he cannot, by any possibility, inherit.

It is said, our authorities mostly relate to maintenance. Be it so. What is champerty? A species of maintenance, which latter is the generic term. *Hawkins*, (*B.* 1, *ch.* 83, *s.* 2, 3) defines maintenance to be of two kinds, *ruralis*, or *curialis;* and he includes champerty, in terms, as being one of the subdivisions of the second head. Every case, therefore, applying to one species, applies also to the other. There is no substance in the distinction; and though, it is said, the first section, concerning champerty, embraces every body, it is the same of the 9th section, which relates to other kinds of maintenance. An offence under one section, would be subject to the same rules as one under the other.

ALBANY,
April, 1824.

Thallhimer
v.
Brinckerhoff.

Indeed, the 9th section is more general and comprehensive than the first.

The two cases cited by his honor, Judge *Woodworth,* from *Viner,* obviate the objection that the contract was with *Thallhimer,* instead of his wife. Her right to maintain is transferred to him, and continues in him, so long as his interest is continued by the marriage, or a tenancy by the curtesy. Indeed, it has become an axiom, that any one having an interest may maintain ; the ground of which is, that it would be absurd for a statute to deny one the right of protecting his own property.

It is said, this must be a certain and definite interest, such as the law will enforce. But what kind of interest is that of the heir apparent or presumptive, which gentlemen admit *forms an exception* ? The law will no more protect his interest, than it will that of the most remote expectant. His interest may be defeated by the ancestor at any time. A vested right, then, of which gentlemen speak, is not the only exception ; nor is the certainty of the right the principle upon which it depends. Why is not our rule, that kindred shall be excepted, equally certain ? We all know what the word kindred means. It is a *good* consideration, as contradistinguished from a valuable one, and every lawyer knows, that a deed, which would be void to a stranger, would be good between kindred. Courts act upon this distinction every day. Counsel advise upon it. You have only to inquire whether the parties are related. Acting upon such a rule would not, as gentlemen apprehend, repeal the act, unless you find a man related to all the world. Why should not a brother or uncle aid his brother or nephew ? Must one stand by and see his relative stripped of his estate ? He has a chance of inheritance which may become absolute the next day. The Court, in *Williams* v. *Conklin,* (8 *John.* 220) sanction this distinction.

But how does it appear that Mrs. *Thallhimer* is not, at least, heir presumptive, admitting the necessity of shewing her to be so. Who is she ? The sister of *Teller,* the owner. If he have no children, she is heir presumptive, though he may have other brothers or sisters. In the absence of

other proof, is it not fair to presume that she is heir presumptive? It lay with the other party to impeach the agreement, by shewing that she was not so.

But it was enough that she was the sister, and, consequently, of the blood of *Teller*.

It was asked, suppose the father had attempted to devise to her by a will imperfectly witnessed, would it be lawful for her to maintain the suit of the heir; upon a contract to have part? I answer, unhesitatingly, yes. A Court, I trust, will never be found to restrain an heir from perfecting such an imperfect will, by carrying into effect the lawful intent of the testator. It was asked, may a father maintain for his son-in-law, in consideration of part to be recovered. I answer this question, also, in the affirmative. The books agree that he may maintain for his son; and it follows that he may for his son's wife, in whose estate the son is interested. So of the daughter's husband.

Again: the saving in the first section of the statute, in favor of counsel, parents and friends, extends to this case. To determine this construction we must refer to the authorities, and we ask no better, for this purpose, than the one cited on the other side. (2 *Inst.* 563, 564.) Lord *Coke* there speaks of *prochein amyes.* The statute means not merely counsel, but aid and assistance. It would be idle for it to except mere *advice*, whether of counsel or friends. Hence the cases make a distinction between legal counsel and the *aid* of friends. Gentlemen put the case, that counsel cannot take part of the thing in controversy; but they wrongly infer that it is the same of friends. The opposite is the fair inference; and this accords with the opinion of the Court below. They cite the 2 *Inst.* 564, which declares, that though the father be impleaded, he may enfeoff his son, for his assistance, maintenance and comfort; for this is nature's profession. What is the meaning of this exposition, but that though counsel may not take part, yet the son may. He may *enfeoff*, &c.; that is, he may convey part in consideration of the son's aid. The language of the exception in the act is, *next friends*; and the *father* is included in the words of the exception by way of example merely. The law of nature, as

*Coke* says, makes it the duty of relatives to support each other. Why did the act make the exception, if it meant merely counsel. It is made in the very statute which speaks of taking a part of the thing in demand. This act was framed from a variety of old statutes, by searching which, it will be observed that this exception is attached immediately to a clause prohibiting champerty. The original act was express, that one might take counsel of a pleader for his fee, or of his next friends. (*Artic. super chart.* 28, *Ed.* 1, *ch.* 11.) The offence is, taking a part of the thing in demand. The exception of the advice of friends would be an idle exception. Our construction is, that you are not only at liberty to advise with your friend, but to give him a part of the thing in controversy. The terms giving liberty to take counsel allow this. It is the officious intermeddling that the statute intended to guard against.

I ask a case, in the whole round of 300 years, where a relative was ever prosecuted for maintenance. I challenge the production of any case of champerty in a near relative; and I do hope the decision of this Court will restore the rule as we contend for it—a rule which the case in the Court below has, for the first time, broken in upon. The father may maintain the son, and yet, by the English law, the estate would escheat before he could inherit it.

But let the agreement be what it will as to other persons, *Brinckerhoff* cannot object to it. I seek not to enforce a contract null and void; but the defendant, a professional man, understanding his rights perfectly, has admitted every thing necessary to make out a complete case against him. He knew, professionally, that the act was not one of champerty. He went on, and instituted suits under the agreement, as attorney of *Teller* and *Thallhimer.* The agreement did not consider the suits certain. For aught the parties supposed, the lands might have been surrendered on sight of the title. The recital, that *Thallhimer's* wife being *Teller's* sister, she was, therefore, in justice entitled, is conclusive upon the defendant, in whose mouth it does not lie to say there was no interest except what arose out of the contract. He recites, it is true, that she had no legal interest,

that is, not the legal title. It is enough that she had a just one. Who can say, that by some act of *Teller's* own, even prior to the marriage, he had not made her interested. I am speaking of the defendant's acts ; his declarations in the agreement, of which he cannot deny one word. He admits a previous interest acquired by marriage. If so, it must have subsisted before the agreement ; and the Court will intend, as against him, that some act was done by which an interest was lawfully conferred. Then it comes to this : two parties having an interest in certain property, the legal title to which is vested in one, agree, that when the property is recovered it shall go to both, according to their respective rights. It is the duty of the Court to seize on every intendment in favor of sustaining an agreement, such as this, made between near relations.

THE CHANCELLOR. Champerty, maintenance, and barratry were defined as offences, in very early stages of the English law. These practices seem to have been then common in England ; and they were denounced not only as sins very heinous in themselves, and highly injurious to the peace of society, but also as offences which actually interrupted the course of public justice. The excitement of suits is an evil, when suits are unjust ; but when right is withheld, and the object of a suit is just, to promote the suit, is to promote justice. That a resort to the public tribunals for justice, should produce injustice, can be true, only where the administration of justice is weak or corrupt, or where the laws are very imperfect. Where the administration of justice is firm, pure, and equal to all, and where the laws give adequate redress for groundless suits, it is not easy to conceive, that mischief can arise from opening the courts of justice to all suitors, or from contracts by which the fruits of a suit may be divided between him who has the right of action, and him who has contributed advice, expense or exertion, to institute the suit, or prosecute it to effect. The right of litigating, may be abused ; and proper remedies for groundless and vexatious litigation, must exist : but the remedies for the abuse of this right, should be such as not to impair the

*Margin notes:*

ALBANY, April, 1824.

Thallhimer v. Brinckerhoff.

Origin, progress and changes of the law in relation to champerty, maintenance and barratry.

ALBANY,
April, 1824.

Thallhimer
v.
Brinckerhoff.

The civil law.

free use of the right itself. As the justice, or injustice of the claim can not be known before the termination of the cause, the checks upon unjust litigation, must in general, consist, not in excluding the suit or the suitor from the courts, but in redress following the decision of justice, upon the merits of the cause.

The Roman law, by its provisions for preventing groundless and vexatious suits, required, that the plaintiff should take an oath, that the suit was not commenced from malice, and that he believed his cause to be legal and just. The defendant was required to swear, that in his belief, the plaintiff had no just claim. The advocates on both sides, were required to take similar oaths. If the plaintiff failed in his suit, he was fined in a sum, which was sometimes a tenth part of the demand; and in cases of great malice and vexation, the plaintiff was farther punished by a decree of ignominy. Inst. book 4. tit. 16. Code, book 2. tit. 59. Dig. book 5. tit. 1. 79. Inst. book 4. tit. 1—33, Huber. Prælect. 457. 1478. Wood's Civil Law, 341.

The English doctrine of maintenance arose from causes peculiar to the state of the society, in which it was established. The great reason for the suppression of champerty and maintenance, was an apprehension, that justice itself, was endangered by these practices. Blackstone, 4 Comm. 135, speaks of this offence, as perverting the process of law into an engine of oppression. In the case of Slywright and Page, 1 Leon. 167, it was said by the whole court of common pleas, that the meaning of the statute of the 32 H. 8, concerning maintenance, was " to repress the practices " of many who when they thought they had title or right " to any land, for the furtherance of their pretended right, " conveyed their interest in some part thereof to great per- " sons, and with their countenance, did oppress the possess- " ors." The power of great men, to whom rights of action were transferred, in order to obtain support and favor in suits brought to assert those rights; the confederacies which were thus formed; and the oppression which followed from the influence of great men, in such cases, are themes of complaint, in the early books of the English law. While the

power of nobles and great men was felt in the administration of justice, these practices seem to have produced real and great evils. In that state of things, instead of invigorating and purifying the administration of justice, as the direct remedy for such evils, the laws concerning champerty and maintenance were established, as penal regulations intended to operate upon the parties to these transactions.

In modern times, and since England has enjoyed a pure and firm administration of justice, these evils are little felt ; and champerty and maintenance are now seldom mentioned, as occurring in fact, or as producing mischief in that country. The statutes for the limitation of actions, the statute of frauds, the extension of the action for malicious prosecutions, and the costs given against unsuccessful parties, have all taken place since the law of maintenance was established ; and all these alterations have contributed to prevent or punish groundless and vexatious litigation.

It was a principle of the common law, that a right of action could not be transferred by him who had the right, to another. When we seek the reason of this rule, we find it in the motive already mentioned, an apprehension that justice would fail, and oppression would follow, if rights of action might be assigned. " Nothing," says Coke, Co. Lit. 114. a. ; " nothing in action, entry, or reentry, can be " granted over ; for so, under color thereof, pretended ti- " tles might be granted to great men, whereby right might " be trodden down, and the weak oppressed." Feeble, partial, and corrupt, must have been the administration of justice, where such a reason could have force. In early times, this rule concerning rights of action was rigorously enforced. As the entire right of action could not be assigned, so no part of it could be transferred, and no man could purchase another's right to a suit, either in whole, or in part. Hence the doctrine of maintenance which prohibits contracts for a part of the thing in demand, was adopted as an auxiliary regulation, to enforce the general principle which prohibited the transfer of all rights of action. But the rule of the common law, that rights of action can not be assigned, has in modern times been reversed ; the apprehension, that jus-

ALBANY,
April, 1824.

Thallhimer
v.
Brinckerhoff.

By the common law, a right of action could not be transferred ;

But this rule has, in modern times, been reversed.

ALBANY,
April, 1824.

Thallhimer
v.
Brinckerhoff.

In the courts of equity, it was never followed;

tice would be trodden down, if property in action should be transferred, is no longer entertained ; and the ancient rule now serves only to give form to some legal proceedings. In the courts of equity, this rule was never followed ; and those courts have always considered and treated the rule as unjust, and have supported assignments of rights of action. Experience has fully shewn, not only, that no evil results from the assignment of rights of action, but that the public good is greatly promoted by the free commerce and circulation of property in action, as well as of property in possession

And though now the same at common law, as to an entire right of action, yet a part can not be transferred.

The general law, both in England and here, now is, that rights of action may be transferred ; and as the laws concerning maintenance are still in force, the present state of the law is, that while an entire right of action may be transferred to a purchaser, with complete effect, a contract to transfer a part of a right of action, is void. The primary rule forbidding the assignment of a right of action, has ceased ; but the auxiliary sanction concerning the assignment of a part of such a right, remains in force. The English judges feeling that the original reasons for the law of champerty and maintenance, had ceased, have gradually mitigated that law, by interpretations and exceptions ; and the present state of English opinion on this subject, may be seen in 4 D. & E. 340, 341 ; where Buller justice, expresses himself in terms which do not disguise his contempt for the whole doctrine of maintenance.

In many of the U. States the laws against champerty, &c. are not in force.

In many of the states of this union, these laws are not in force ; and the want of them, is said to be no inconvenience.

These observations are made to show, that in examining the English law, and English authorities concerning champerty and maintenance, we must, in order to ascertain the sense and extent of their doctrines, bear in mind the state of society which produced them, the evils for which they were intended to afford a remedy, and the different state of things, to which they are now applicable. It is only by this recurrence to history, that we can trace the true reasons of the English law ; the causes of the horror with which the

maintenance of suits was viewed in early times ; the decline and fall of the rule of the common law, that things in action were not vendible ; and the different views, which at different times have had influence upon the judicial expositions of the law of maintenance, in England.

Our statute concerning champerty and maintenance, is a compilation of the several English statutes relating to the same subjects ; and it declares certain contracts void. This statute throughout, makes or supposes, a distinction, which before prevailed in the rules of the common law, between maintenance which is innocent, and that which is unlawful. To maintain the suit of another, is unlawful, unless the person maintaining, has some interest in the subject of the suit, or unless he is connected with the suitor, in some social relation. These are the exeptions to a general rule ; and they are exceptions which rest upon the strongest ground of reason, as well as the support of authority.

Where the person promoting the suit of another, has any interest whatever in the thing demanded, distinct from that which he may acquire by an agreement with the suitor, he is in effect, also a suitor, according to the nature and extent of his interest. To deny to such a person the benefit which he might receive from a suit conducted mainly or partly, for the benefit of another, would be to close the temple of justice against all persons not parties to the suit, and yet having interests in the subject of litigation, which may be affected by the determination of the cause. It is accordingly a principle, that any interest whatever in the subject of the suit, is sufficient to exempt him who gives aid to the suitor, from the charge of illegal maintenance. Whether this interest is great or small, vested or contingent, certain or uncertain, it affords a just reason to him who has such an interest, to participate in the suit of another, who also has or claims, some right to the same subject. Bac. Abr. tit. Maintenance, letter B., and the several authorities there cited.

Where there is consanguinity or affinity between the suitor and him who gives aid to the suit, the voice of nature, and the language of the law equally declare, that such assis-

ALBANY,
April, 1824.

Thallhimer
v.
Brinckerhoff.

Our statute upon this subject is a compilation from the English statutes on the same subject. It makes or supposes a distinction throughout, between innocent and unlawful maintenance. To maintain the suit of another, is unlawful, unless the person maintaining has some interest in the subject of the suit, or is connected with the suitor in some social relation. Having such interest he is, in effect, himself a suitor :

And whether the interest be great or small, vested or contingent, certain or uncertain, he may maintain.

So where there is consanguinity, or affinity be-

ALBANY,
April, 1824.

Thallhimer
v.
Brinckerhoff.

tween the suitor and him who aids the suit, the assistance is lawful.

The laws against champerty, &c. were intended to prevent the interference of strangers, having no pretence of right in the subject of the suit, and standing in no relation of duty to the suitor.

The same rules and exceptions apply both to champerty and maintenance, the former being maintenance in a particular form.

The husband of one, who may by possibility be heir to the suitor, of the land in dispute, may maintain the action of the suitor, upon an agreement to have part of the land, in consideration of the maintenance.

tance is not unlawful maintenance. The relation of landlord and tenant, that of master and servant, acts of charity to the poor, and the exercise of the legal profession, are all cases in which it is not unlawful to give aid in the conduct of suits before the courts of justice.

Upon all such cases, these laws were never intended to operate. They were intended to prevent the interference of strangers having no pretence of right in the subject of the suit, and standing in no relation of duty to the suitor. They were intended to prevent traffic in doubtful claims, and to operate upon buyers of pretended rights, who had no relation to the suitor or the subject, otherwise than as purchasers of the profits of litigation.

It has been urged, that champerty and maintenance are distinct offences ; and that champerty is illegal, in many cases, in which maintenance in other modes, would be lawful. If principles are considered, it seems to be of little moment, whether he who maintains the suit of another, receives his reward from the subject of the suit, or from any other property of the suitor. Champerty is one species of maintenance ; but the authorities do not declare contracts for a part of the thing in demand, universally unlawful. The distinction made by the books, between interference which is illegal, and that which is lawful, consists, in the rule, and the exceptions already stated ; and where maintenance is lawful, as in the case of interest in the subject, or relation to the suitor, a contract to divide the subject of the suit, which is maintenance in a particular form, is also legal.

In this case the wife of Thallhimer was the sister of Teller ; and this relation, recited in the contract, evidently led Thallhimer and Teller to the contract itself. Thallhimer did not obtrude himself into the concerns of a stranger ; but he agreed to give aid to his relative, as he might justifiably do. He was not the promoter of litigation, in which he had no concern. His wife might inherit Teller's lands ; and this reason alone, exempts the contract before us, from the imputation of champerty, or illegal maintenance. It is immaterial to this question, whether the contingencies which must occur, before Teller's sister could inherit, were such

as to render that event probable or not. She might become the owner of these lands, as the heir of Teller ; and this potential interest, was a sufficient reason, that her husband should join in measures to recover the lands.

The charge of champerty or maintenance, being the only objection made to this agreement, and that objection not being applicable to this case, the agreement is valid. The action now brought against Brinckerhoff, is assumpsit for money received by him for the use of Thallhimer. The contract not transferring any right in the lands themselves, to Thallhimer, the legal title remained in Teller, who had power to bring suits, to compromise the claim, and to release the legal title. Teller did compromise the claim and did release the legal title to the possessors of the land, for a sum of money ; this was done by Brinckerhoff acting under a power from Teller, and the money was received by Brinckerhoff. After these facts had occurred, there never could be a conveyance of any right in the lands, from Teller to Thallhimer; and the agreement could have effect, only by considering the money received, as substituted for the land, in respect to the rights of Thallhimer under the contract. This construction gives effect to the contract ; and must be adopted as the sense of the contract itself, and as a necessary consequence from the events succeeding the contract, which rendered any conveyance of a right in the lands impossible. The compromise was valid, both in respect to Teller, and the possessors of the land ; and if this agreement now has any effect, it must operate upon the money received, as it might have operated upon the land, had the land itself been specifically recovered. If this contract could be defeated by acts of Teller and Brinckerhoff, in which Thallhimer had no part, and over which he had no control, the most flagrant injustice would be done to Thallhimer. The sense of the contract evidently is, that in the event of success, Thallhimer shall have one fourth part of the property ; whether the fruits of the claim should be realized in one species of property, or another.

Vol. III.                 83

ALBANY,
April, 1824.

Thallhimer
v.
Brinckerhoff.

The action for
money       had
and    received
is    proper   in
this case ;

ALBANY,
April, 1824.

Thallhimer
v
Brinckerhoff.

And is cor-
rectly brought
in the name of
Thallhimer a-
lone.

The rights of Thallhimer in this suit, arise from his agreement with Teller, from the act of Teller in authorising the compromise, and from the acts of Brinckerhoff, in commencing the actions of ejectment, in making the compromise and in receiving the money. In commencing the actions of ejectment, Brinckerhoff acted as the attorney of both Thallhimer and Teller. In making the compromise, he acted as the agent of Teller, in respect to the possessors of the land ; for Teller having the legal title, he alone could give a power to compromise. But as Brinckerhoff had full knowledge of the rights of Thallhimer under the agreement, he may be justly regarded, in making the compromise, as the agent of both Thallhimer and Teller, in respect to their rights, and according to their respective interests. In these circumstances, the action for money received for the plaintiff, is entirely proper ; the use of that form being, to allow the introduction of the express contract, and all the acts of the parties ; and also to give effect to any tacit promise which law and justice may infer from all the facts of the case. The agreement determines, that Thallimer's share of the money, is one fourth part ; and Brinckerhoff has not paid, as he ought not to have paid, this fourth part to Teller. This share is money belonging to Thallhimer, and remaining in the hands of Brinckerhoff. Thus, the objections made to the form of this suit, appear to be destitute of weight.

My opinion is, that the judgment of the supreme court should be reversed, and that the cause should be again sent to trial.

The Court being unanimously of this opinion, it was, thereupon, ORDERED, ADJUDGED and DECREED, that the judgment of the Supreme Court, in this cause, be reversed, with costs in error to be taxed for the plaintiff in error ; and that the transcript be remitted to the said Supreme Court ; and that the said Court award a *venire facias de novo.*