Robertson & Hobbs v. Cayard.

ROBERTSON & HOBBS *v.* E. C. CAYARD.

*(Knoxville.* September Term, 1903.)

1. **VERDICT.** For plaintiff for personal injuries from defective engine and equipment, supported by the evidence.

Where it appears that a locomotive engineer receives personal injuries resulting in his death, on account of a defective engine, and insufficient equipment of the cars with brakes and brakemen, with information of defects in engine, but with assurances from the employer that the train could be controlled by such equipment of the cars, and that it was safe to operate it, a verdict in favor of the plaintiff employee against the defendant employer is supported by the evidence. (*Post, pp.* 357-362.)

2. **CONTRIBUTORY NEGLIGENCE.** Question for jury, and is settled by their verdict, when.

It is well settled that the question of contributory negligence is a matter for the settlement of the jury, and their verdict in this case in favor of the plaintiff for personal injuries settles that issue in his favor. (*Post, p.* 362.)

3. **CHAMPERTY.** At common law did not affect the original suit.

At common law, a champertous contract between a client and his solicitor did not destroy the right of the client to prosecute the original cause of action. It only vitiated such illegal contract. (*Post, pp.* 362-367.)

Cases cited and overruled on this point: Webb v. Armstrong, 5 Hum., 381.

Case cited: Douglass v. Wood, 1 Swan, 394.

Cases cited and approved: Byrne v. Railroad (C, C.), 55 Fed., 44; Burnes v. Scott, 117 U. S., 582; Thallhimer v. Brinckerhoff, 3 Cow., 623; Boone v. Chiles, 10 Pet., 177; Whitney v. Kirtland, 27 N. J., Eq., 333; Robinson v. Beall, 26 Ga., 17; Allison v. Railroad, 42 Iowa, 274; Hilton v. Woods, L. R. 4 Eq., 432; Elborough

Robertson & Hobbs v. Cayard.

v. Heirs, L. R. 10 Eq., 367; Evans v. Prothero, 1 De G., M. & G., 572.

**4. SAME.** Whether repeal of champerty statutes revived common law reserved.

The question is reserved whether the statute (Acts 1899, ch. 173), repealing certain provisions of our champerty statutes (Shannon's Code, secs. 3176-3184) operated to revive the common law as it existed prior to the enactment of the repealed statutes, but without deciding this question, it is held to be clear that the repeal did not leave in force a penalty which existed only by virtue of the repealed statute. (*Post, pp.* 362-363, 367.)

Cases cited: Heaton v. Dennis, 103 Tenn., 162; State v. Slaughter, 70 Mo., 484.

Acts cited: 1821, ch. 66; 1899, ch. 173.

---

## FROM COCKE.

---

Appeal from the Circuit Court of Cocke County.— G. MᶜHENDERSON, Judge.

G. W. PICKLE, and WILEY JONES, for Robertson & Hobbs.

R. E. L. MOUNTCASTLE and G. W. GORRELL, for Cayard.

---

MR. JUSTICE MCALISTER delivered the opinion of the Court.

Plaintiff below recovered a verdict and judgment against Robertson & Hobbs in the sum of $5,000 as damages for personal injuries which resulted in his death.

The suit was brought by E. C. Cayard in his lifetime, and after his death it was prosecuted under the statute for the benefit of his widow and child.

The facts disclosed in the record are that the defendants, Robertson & Hobbs, were contractors, and at the time of the accident were engaged by the Southern Railway Company in changing the grade of its track east of Newport. E. C. Cayard was employed by said contractors in the capacity of a locomotive engineer, whereby it became and was his duty to operate an engine with an attached train of cars in hauling dirt between the steam shovel and the fill, a distance of something more than a mile. The track over which the train was being run was on a steep grade for a few hundred yards from the shovel to the top of the hill, and then down a heavy grade to the temporary trestle where the fill was being made. The plaintiff was a member of the night crew, and the accident occurred in the nighttime.

It is alleged that in September, 1900, Cayard undertook to run said engine with a train of cars from the steam shovel to the fill, and that in consequence of said defect in the engine and the insufficient equipment of brakes and brakemen he was unable to control the speed of the train, and, the same becoming unmanageable, the engine ran out upon said trestle, which broke through, thereby precipitating the engine and cars to the ground below, and inflicting the injuries which resulted in plaintiff's death.

The gravamen of the action is that the said Cayard was furnished by defendants with a defective engine— that is to say, one with a steam jam out of repair; and that the cars were not provided with sufficient brakes, nor with a sufficient complement of brakemen. The alleged defect in the engine is more specifically described in the amended declaration, which avers that said engine "had a weak, defective, and patched-up steam jam, with weak, worn, rusted, and defective screws and taps, which were not strong enough to stand a sufficient pressure of steam to hold or control said engine and cars."

It is further alleged in said amended declaration that said cars were old, rickety, defective, and unfit for use, and were entirely without brakes, excepting two out of thirteen, or about that number, constituting the train at the time of the injury.

It is then alleged that said trestle was not of sufficient strength to support the weight of said engine, being constructed of wood, with small, shaky, rickety poles for its support, and small, weak timbers throughout, improperly and insufficiently placed, braced, and supported.

There is ample evidence in the record to show that the engine was defective in the particulars alleged in the declaration, and it is reasonably certain that, but for these defects, the accident would not have happened.

It is also shown in the proof that the cars were not provided with sufficient brakes and brakemen, especially in view of the defective condition of the engine—a fact

which was known to the foreman of Robertson & Hobbs. The foreman, one Layman, was in charge of the night shift, and the other employees were subject to his orders and control. The trains were made up under his direction and supervision.

The red line cars, which were heavier, were never used before on the night shift. The proof shows that there were thirteen cars in this particular train, and that only two of them had upright brakes, and it is shown that the side brakes with which they were provided were not intended for use in controlling the train. It is further shown that there was only one brakeman on this train.

It is probable from this proof that, if the cars had been properly provided with brakes and brakemen, the accident would have been avoided, notwithstanding the defects in the engine.

The trestle was thirty feet high, and was built at the foot of a steep incline. It was very defectively constructed, and wholly insufficient to sustain the weight of the engine. However, it was not expected that the engine would be drawn upon this trestle, and it was contrary to orders to do so. The rule was for the cars to be backed upon the trestle, and their contents dumped therefrom. It is insisted that Cayard was guilty of such contributory negligence that he is not entitled to a recovery. It is said that he knew of the defects in the engine, and that he knew of the insufficiency in equip-

Robertson & Hobbs v. Cayard.

ment of the cars with brakes and brakemen, and that he was apprised of the weakness of the temporary trestle.

It may be stated as a conclusive answer to the last suggestion that, as a matter of fact, the engineer did not voluntarily take his engine upon this trestle, but that it became unmanageable on account of the defects described, and went upon the trestle, despite his efforts to prevent it.

On the night of the accident, Cayard was put in charge of engine 52 on the night shift for the first time. Prior to this time he had been running a different engine on the night shift, with better equipment and brakes. When he mounted his engine on the night of the accident he was informed by the engineer who had been operating that engine during the day, and also by Layman, the foreman, that the steam jam or brake did not work perfectly, but they both assured him that the train could be controlled by the brake in its then condition, and that it was safe to operate it. It appears that Layman, the foreman had used this engine in drawing the train up from the water tank just before it was placed in charge of Cayard, and that he, with Cayard, examined it, assuring the latter, as he left the engine, that it was all right, and that it could be operated safely. It was known to Layman at the time that the train was one of unusual weight, and that it was not supplied with the usual equipment of brakes. It is not insisted that Cayard knew of the insufficient equipment of the cars with brakes and brakemen. It is only contended that he

should have known.   It appears that Layman, the night foreman, although accustomed to attend the engine on these trips, for some reason not appearing, left the train before it started down the grade.

It is well settled that the question of contributory negligence is a matter for the settlement of the jury, and their verdict in this case has settled that issue in favor of the plaintiff.   Moreover, we find ample evidence to support the verdict of the jury, and the assignment of error to the contrary is overruled.

It is next assigned as error that the court struck out the plea of champerty interposed by the defendant company.   The plea stricken out by the court is as follows:

"That the contract entered into by plaintiff and his attorney, W. H. Jones, under which contract this suit is being prosecuted, is champertous and void, in that the said W. H. Jones was and is to pay the expenses of this suit, and to receive twenty per cent of the amount recovered if the recovery is small, and less per cent on a larger judgment, as a fee in the case; and that, in the event no recovery is had against the defendants herein, he, the said Jones, is to receive no fee or other compensation for his services, said fee being entirely contingent upon the recovery herein."

It is said that the court, in striking out this plea, proceeded upon the assumption that the champtery law had been repealed by statute (chapter 173, p. 321, Acts 1899).   It is insisted that in this assumption the court was in error; that the statute in question only repealed

certain sections of the Code upon the subject of champerty and maintenance, and does not assume to legislate on the law of champerty as it existed and was recognized prior to the passage of the law repealed, which was Act 1821, c. 66. It is argued that Act 1821, c. 66, was an extension of the common-law idea of champerty, and especially an enlargement of remedies provided against it. It is claimed that champerty at common law was not only a cause for dismissal of a suit, but was an indictable offense, and that the act of 1821 denounced certain acts as champertous which were not so regarded prior to its enactment.

It is stated in the case of *Douglass* v. *Wood's Lessee,* 1 Swan, 394: "By the common law, or rather, perhaps, by ancient statutory enactments which became incorporated into the common law long before the 32 Henry VIII, c. 9, champerty was known and recognized as an offense falling within that numerous class denominated 'offenses against public justice,' and was punishable by fine and imprisonment, and so was the offense of maintenance."

It was also said by this court in *Webb* v. *Armstrong,* 5 Hum., 381, as follows:

"The statute, by pointing out the means to ascertain champertous agreements by bill and by interrogatories formally propounded, did not intend to restrict, but amplify, the remedies for punishing such agreements. Before the statute and since the statute, if it satisfactorily appear to the court in proof that the suit in its origin

and progress is affected by champerty, it is the duty of the court not to permit itself to become the organ and instrument to consummate such agreements, but to repel the plaintiff and his suit."

In 4 Blackstone's Commentaries, p. 135, champerty at common law is thus defined, viz.: "A bargain with a plaintiff or defendant *campum partire* to divide the land or other matter sued for between them, if they prevail at common law, whereupon the champertor is to carry on the party's suit at his own expense."

It is insisted that the act of 1821 was an extension of the common law, since it was made an offense under this statute to agree upon the payment of a contingent fee, although the champertor has not agreed to bear the expense of the lawsuit. It is claimed in argument that the repeal of our champerty statute simply restores the law of champerty as it existed at common law prior to the enactment of the statute. It is denied, on the other hand, by counsel for the plaintiff, that the repeal of the statute has the effect to revive the common law as it existed prior to the passage of the statute. Counsel cite in support of this position *State* v. *Slaughter,* 70 Mo., 484. The clear intimation of this court in *Heaton* v. *Dennis,* 103 Tenn., 162, 52 S. W., 175, is that the State, by repealing the champerty statutes, has changed its entire policy on this subject. It is not necessary, however, that this question should be definitely decided in the present case.

It is further denied that at common law in England

or in this country proof of a champertous agreement constrained a dismissal of the suit, but that it only invalidated such illegal contracts.   4 Ency. of Pl. & Pr., 370.

It was held in *Byrne* v. *Railroad*  (C. C.), 55 Fed., 44, that the statute, and not the common law, inflicted this penalty of dismissal, and the federal courts have declined to follow this provision of our statute.

The question presented herein arose in the case of *Burnes* v. *Scott,* 117 U. S., 582, 6 Sup. Ct., 865, 29 L. Ed., 991.   Said the court:

"The question raised by the present assignment of error is not whether a champertous contract between counsel and client is void, but whether the making of such a contract can be set up in bar of a recovery on the cause of action to which the champertous contract relates.   We must answer this question in the negative. It was wisely said by the supreme court of New York in the case of *Thallhimer* v. *Brinckerhoff,* 3 Cow., 623 (15 Am. Dec., 308), that:   'The right of litigation may be abused, and proper remedies for groundless and vexatious litigation must exist, but the remedies for the abuse of client's right should be such as not to impair the free use of the right itself.   As the justice or injustice of the claim cannot be known before the termination of the cause, the checks upon unjust litigation must, in general, consist, not in excluding the suit or the suitor from the courts, but in redress following the decision or justice upon the merits of the case.' "

This is in accord with the views of this court. The precise question under consideration was decided in the case of *Boone* v. *Chiles,* 10 Pet., 177, 9 L. Ed., 388. That was a bill in equity to establish the title to a tract of 700 acres of land in Bourbon county, in the State of Kentucky. Among other defenses, it was alleged that an agreement in writing had been made between Boone, the plaintiff, and one Engles, by which Engles undertook at his own expense to prosecute a suit for the 700 acres in dispute, and as a consideration for his trouble was to have one-half of the land, and that the suit was prosecuted under that agreement; that it was, therefore, a case of champerty and maintenance, forbidden by law, in which the court could give no relief. But the court held that, although the English statutes which had been adopted in Kentucky punished the offense, and declared the contract for maintenance void between the parties, the right of plaintiff was not forfeited by such an agreement, and it might be prosecuted against the defendants, whether the contract with Engles was valid or void.

The same rule has been declared in other American cases, viz., *Whitney* v. *Kirtland,* 27 N. J. Eq., 333; *Robison* v. *Beall,* 26 Ga., 17; *Allison* v. *C. & N. W. R. R. Co.,* 42 Iowa, 274. So, in *Hilton* v. *Woods,* L. R., 4 Eq., 432, it was strenuously urged that the bargain between the plaintiff and Mr. Wright, under which the suit was instituted, amounted to champerty and maintenance, and consequently disqualified the plaintiff to sue, and that the court was bound to dismiss the bill. But the vice

Robertson & Hobbs v. Cayard.

chancellor said: "I have carefully examined all the authorities which were referred to in support of this argument, and they clearly establish that whenever the right of plaintiff in respect of which he sues is derived under a title founded on champerty or maintenance, his suit will, on that account, necessarily fail. But no authority is cited, nor have I met any, which goes to the length of deciding that, when a plaintiff has an originally good title to the property, he becomes disqualified to sue for it by having ventured into an improper bargain with his solicitor as to the mode of remunerating him for his professional services in the suit or otherwise." See, also, *Elborough* v. *Heirs*, L. R. 10 Eq., 367; *Evans* v. *Prothero*, 1 De G., M. & G., 572.

We are of the opinion that the statement in *Webb* v. *Armstrong*, supra, that before the statute proof of a champertous agreement would constrain a dismissal of the suit was inadvertently made. That case arose after the passage of the statute, and was, of course, governed by the statute, which superadded to the common law the penalty of a dismissal of the suit. But at common law, as we have seen from the authorities, proof of a champertous contract between a client and his solicitor did not destroy the right of the former to prosecute the original cause of action. It only vitiated the illegal contract. Without deciding the question whether the repeal of the statute revived the common law, it is clear that it does not leave in force a penalty which existed only by virtue of the statute.

We find in this record no reversible error, and the result is the judgment must be affirmed.