BYRNE v. KANSAS CITY, FT. S. & M. R. CO.

(Circuit Court, W. D. Tennessee. February 19, 1893.)

No. 3,214.

1. CHAMPERTY — DEATH BY WRONGFUL ACT — AGREEMENT BETWEEN ADMINISTRATOR AND BENEFICIARY—TENNESSEE STATUTE.
    An attorney suing as "administrator" to recover for a death by wrongful act, under Mill. & V. Code Tenn. §§ 3130, 3134, may be guilty of a champertous agreement with the beneficiaries, which may be pleaded as a defense to the suit under sections 2445–2458, investing courts of law with equity powers for the purpose of discovering and preventing the offense.

2. SAME—CONSTRUCTION.
    The Tennessee statutes against champerty were enacted with a view to the peculiar circumstances of the early settlement of that state, particularly the common practice of speculation in defective land titles, and therefore the English statutes and decisions on this subject, made under wholly different circumstances, are not controlling in Tennessee as to the interpretation of the statute.

3. SAME—FEDERAL COURTS—FOLLOWING STATE PRACTICE.
    Although federal courts might give effect to state statutes against champerty by disbarment of the guilty person, or by other means consistent with their jurisdiction and procedure, yet the provision of Mill. & V. Code Tenn. § 2452, allowing the champertous agreement to be set up in a plea in abatement in the action to which it relates, not being a rule of property nor of practice and procedure within the meaning of acts of congress requiring federal courts to follow state practice in such matters, is not binding on federal courts, since their jurisdiction cannot be limited by state legislation.

At Law. Action by Francis J. Byrne, administrator, against the Kansas City, Ft. Scott & Memphis Railroad Company to recover for a death by wrongful act of defendant. Heard on demurrer to plea in abatement. Demurrer sustained.

Adams & Trimble, for the demurrer.
Francis J. Byrne, opposed.

HAMMOND, J. This is a suit for personal injuries. There is a plea of champerty under our Tennessee statute, and a demurrer

to it. The plaintiff is an attorney at law, and the averment is that he has entered into a contract with the sole distributee or heir at law of the intestate for one half of the recovery as his fee, contrary to the statute in that behalf. Mill. & V. Code Tenn. §§ 2445–2458.

It is insisted that the case does not fall within the statute, since the plaintiff cannot make a champertous agreement with himself for the prosecution of the suit; and since his recovery will become assets in his hands, to be strictly accounted for in the court of administration, where he can be allowed only his commissions; and, moreover, whatever may be paid to him by the distributee upon whatever contract is necessarily a payment taking effect after the recovery and after a distribution by the court of administration.

Plausible as this may seem, I do not think the statutes against champerty can be so evaded. It is like our pension laws, which forbid the attorney to take more than a fee of $10, but, the money being in fact all paid to the pensioner, and his absolute dominion thus established, so that he might do what he pleased with his own, if he choose voluntarily to recompense his attorney with a larger sum, this would not be against the statute, it has been often contended. But the courts have not taken that view, and men have gone to the penitentiary for reliance upon it.

But there is another answer to this contention. Our statute giving damages for death by the negligence of another gives the recovery to the widow or next of kin in their own right, and they may sue for it in their own names. Mill. & V. Code, §§ 3130–3134. It is true that the administrator may also sue, but the recovery is not assets in his hands, either for creditors or distributees, except, possibly, in the very barest technical sense. Id. §§ 3130, 3133. His relation to the ownership of the fund is more like that of a trustee for the beneficiaries, or of a statutory agent, than that of administrator, which he is merely in name. A little thought upon this distinction brings out quite clearly the unsubstantial character of the suggestion that he cannot bargain champertously with himself as plaintiff. Besides, a court of equity would quickly get behind this technicality in a court of law, and it is to be observed especially that our Tennessee statute against champertous agreements invests the courts of law with the powers of a court of equity for the purpose of discovering and punishing the offense. It is, in substance and in fact, as we have the question here, a contract by the attorney with the owner of the right of action to share the fund recovered, and is to all intents and purposes champertous, according to the statute.

But the statute does not and cannot in its entirety apply to the federal courts. It is not within the competency of the legislature of Tennessee to direct when the federal courts shall dismiss a suit pending there, either as a penalty for a statutory offense or otherwise. I state this proposition broadly, and think it will find a ready assent with every one; but it is not the broader proposition of the plaintiff that this statute has no application in the

federal courts, and that they have no law of champerty. The supreme court has never decided that, I think. For clearly it is within the authority of the states to regulate this subject, and, so far as their legislation can operate, it will be not only effectual in the federal courts, but they will do all that should be done to enforce it, whatever they may think or have expressed as to the policy of such laws. In one sense, the federal courts have no law of larceny as the state courts have it, and yet in some ways they give effect to the state laws against it. No convicted thief would be allowed to practice law in the federal courts. They would declare void any thief's claim of ownership of property he had stolen where the question arose within their jurisdiction. They would restore the stolen goods whenever the proper process was available in their jurisdiction. And if the state statutes to suppress larceny should declare some statutory rule of property, or should disfranchise from civil or political rights the convicted thief, or even if they should invent some new legal or equitable remedy of a civil nature, hitherto unknown, for the suppression of the trespass on property rights involved in the commission of the offense, the federal courts would give effect to such statutory declarations, and use the new remedies, if possible to adjust them to their jurisdiction and procedure. In the same way they will give effect to these laws against champerty, and this necessitates a scrutiny into their character, in order to determine just what relation they may have to the federal jurisdiction, which relation, I find, necessarily perhaps, somewhat complicated. But I have no doubt the plaintiff is mistaken in saying broadly that they are not binding on us, or that the federal courts discountenance laws against champerty, and do not recognize them.

At common law, or under old English statutes that ordinarily pass for common law with us, there were the kindred offenses of common barratry, maintenance, and champerty, which were punished by disbarring or "disabling" the offender, if an attorney, by fine and imprisonment, transportation, forfeiture of money, treble damages, etc. 4 Bl. Comm. 134. The offenses there described did not perhaps include that which has been set up in the plea we have in hand. It is not necessary to do more than refer to the disputed question whether an agreement by an attorney to take for his fee a percentage of the recovery, or to measure his fee by a percentage of the recovery, was champerty at common law, for it may be conceded here that it was not. Since then the Tennessee legislation has superseded the common law in this state, and it is only to that we need look. Undoubtedly, under the Tennessee statute, an agreement by the attorney, such as is set out in this plea, is champerty. Very early in the history of this state—indeed contemporaneously with its beginning as a state, and before that in the mother state—those "pests of civil society that are perpetually endeavoring to disturb the repose of their neighbors and officiously interfering with other men's quarrels," as they are described by Blackstone, afflicted our pioneer ancestors, especially in the fierce struggle that went on over the occupation rights and other titles pertaining to the settlement of the new lands

that were being taken up. And largely these "land sharks" were lawyers, or were in league with lawyers, searching for infirmities in titles, and taking advantage of them to stir up litigation. These statutes were intended to suppress those evils, and had a purpose somewhat different from the English acts, or rather a somewhat different cause for existence than those about which so much has been said by counsel, following some expressions of the supreme court of the United States in relation to the change of conditions which provoked the English acts of parliament. They are modeled on the English law, but are radically different in their origin as to the conditions of society which produced them. It was no fear of nobles or great men, or their influence with courts and juries, that produced these Tennessee statutes, for as a fact the courts and juries could be relied on for action against the purchasers of these titles; but it was the hostility of public sentiment to the "land sharks" who were speculating in litigation over defective titles, and particularly to lawyers lending themselves to this speculation for profit, which provoked statutes seeking to enlarge the English acts just because they did not reach the evil sought to be suppressed. Hence what is quoted so extensively by counsel from the supreme court as to the champerty of the common law and English statutes is quite inapplicable in the consideration of our Tennessee Code on this subject. Roberts v. Cooper, 20 How. 467; Burnes v. Scott, 117 U. S. 582, 6 Sup. Ct. Rep. 865; Stanton v. Embrey, 93 U. S. 548; Taylor v. Bemiss, 110 U. S. 42, 3 Sup. Ct. Rep. 441; Thallhimer v. Brinckerhoff, 3 Cow. 623; 3 Stubbs, Const. Hist. 532–541; 3 Steph. Dig. Crim. Law, 236–238.

Not more under our Tennessee statute than under the Missouri laws considered in Burnes v. Scott, supra, can the making of a champertous contract between counsel and client "be set up in bar of a recovery in the cause of action to which the champertous contract relates." That was what was decided in that case. Now, our Tennessee statutes, while greatly enlarging the English acts, do not at all attempt to operate on the cause of action to which the champertous agreement relates, except that the court is required to dismiss the suit brought upon the cause of action under the champertous agreement. Mill. & V. Code, § 2452. But any other suit may be brought where no champertous contract has been made. The statute makes the champertous contract void, and this would seem to be sufficient; and there may be something of mere vindictive sentiment in dismissing a suit because of a void contract about it when the parties, by revoking the void contract, or the plaintiff, by employing another attorney, with whom no such contract has been made, may bring a new suit; but this is one of the penalties of the statute, in addition to the others. It closes the court to that suit by requiring it to be dismissed because of the wrongful and criminal conduct of the parties in making a champertous agreement about it. That is the full extent of the penalty. It is perfectly plain, to my mind, that the Tennessee legislature cannot thus control, direct, or in any way prescribe a rule of dismissal or closing of the court in another jurisdiction over which it has no dominion. It is not a rule of property in any sense; therefore our acts of congress requiring the fed-

eral courts to administer the rules of property prevailing in the states do not apply. Neither is it in any sense a rule of practice or procedure in the conduct of the suit at law, to which our conformity practice act applies. Superficially it might seem a rule of practice, but it clearly is not in the sense of the act of congress. It is a somewhat sentimental penalty or punishment for making the champertous agreement, and possibly involves nothing more serious than the costs of the abortive suit; but, no matter how serious it be, or what may be said if its efficiency, it is a condition attached to the right of standing in the courts which the state legislature cannot impose on those resorting to the federal courts.

Perhaps it is not within the competency of the legislature, under our constitutional limitations, to have annulled the cause of action to which the champertous contract relates by forbidding any and all suits to be brought upon it because of the offense, thus, in effect, destroying it, or at least impairing it; but it will be sufficient to consider that question when the legislature undertakes to do that which it has not yet undertaken. If it be within the power of the legislature to pass such a law, it might then be a rule of property which the federal courts would enforce; but that, too, is a question not arising here. Closing the court to that one suit is not even pro tanto a rule of property, but, as before suggested, only a penalty of costs, at most

Yet, as to the other penalties of this statute, they might be enforced in the federal courts, or rather find effect there. The champertous agreement itself would be held void as a rule of property, perhaps. The attorney bringing such a suit in a state court could be disbarred for five years, but it is to be observed that the penalty is limited to disqualification to practice in any of "the courts of this state." If so disqualified by being "stricken from the list of attorneys," he could not, probably, practice in the federal courts, for, congress having never undertaken to license, regulate, or declare the qualifications of attorneys, we make up our list from the state list, and, being disqualified there, he might be disqualified here, at least until congress regulates the privilege in some way of its own, instead of leaving it to the states, as has been done. Or possibly, if a motion were made here to disbar an attorney for committing an offense against the laws of the state, this court might say that one so conducting himself should not practice in this court; but as the statute does not, in terms, apply except to suits brought in a state court, and it is for bringing them there that the penalty of dismissal is attached, and this seems more doubtful than the other suggestions above made. But, however these things be, it is going too far to say that these statutes are not binding in the federal courts, and we only hold that so much of the penalties prescribed as direct that a suit brought in pursuance of the champertous agreement shall be dismissed, not being a rule of property, nor a matter of practice or procedure, but a condition, cannot apply to this court, for the simple reason that only an act of congress can impose such a condition upon its courts or give them such a command. Demurrer sustained.