[Civ. No. 14447.   First Dist., Div. Two.   June 15, 1951.]

PHALANX AIR FREIGHT, INC. (a Corporation), Respondent, v. NATIONAL SKYWAY FREIGHT CORPORATION (a Corporation), Appellant.

Burns & McKeever and James E. Burns for Appellant.

Dudley Harkleroad and Rudolph J. Scholz for Respondent.

DOOLING, J.—Plaintiff had judgment against defendant for damages for breach of contract. Defendant was operating airplanes as an uncertified carrier, i. e., it was not authorized to hold itself out as a common carrier but was authorized only to operate as a contract carrier. Being thus unable to solicit freight in less than plane-load shipments defendant arranged with plaintiff to engage in the business of freight forwarding, whereby plaintiff would enter into contracts with individual shippers for the shipment by air of less than plane-load lots and after combining such individual shipments into plane-load lots forward them by defendant's planes. Pursuant to this arrangement plaintiff engaged in the business of freight forwarding in San Francisco using the facilities of defendant for the air transportation.

On November 15, 1946, the parties reduced their contract to writing and it is for the breach of this written contract that plaintiff recovered, based on the fact that on January 10, 1947, defendant ceased its operations by air to and from San Francisco.

On this appeal defendant argues that the written contract did not bind it to maintain air operations to and from

San Francisco and that the contract was illusory because of lack of mutuality. By the terms of the writing defendant bound itself "to transport said shipments for Forwarder (plaintiff), all upon and subject to and in accordance with provisions set forth in this contract. . . . Air Carrier (defendant) shall load said merchandise on the airplanes of Air Carrier at the times and at the originating airports mutually agreed upon by the parties." Attached to the agreement as an exhibit was a schedule of rates which included rates "San Francisco and New York" and "San Francisco and Chicago." The evidence further showed that both before and after the execution of this writing plaintiff's business with defendant was in San Francisco. The conduct of the parties fully supports the finding that the San Francisco airport was an "originating airport mutually agreed upon by the parties" within the meaning of that language as used in the contract. It is hornbook law that a contract is to be construed to give it a reasonable effect (Civ. Code, § 1643; 6 Cal.Jur., Contracts, § 169, p. 271) and any other construction of the contract here in question would do violence to this salutary rule.

■ The contract contained a provision making it terminable by plaintiff "at any time by giving Air Carrier at least thirty (30) days notice." This did not render the contract illusory as contended by defendant. While a provision for termination by one party at will has that effect a provision for termination after notice for a fixed period does not. (*Brawley* v. *Crosby etc. Foundation, Inc.*, 73 Cal.App.2d 103, 113 et seq. [166 P.2d 392]; 1 Williston on Contracts, rev. ed., § 105, p. 365; 17 C.J.S., Contracts, § 100(g), p. 453.) Plaintiff bound itself to ship by defendant's planes "all freight over which it has control" and it was bound to do this until notice of termination and for thirty days thereafter. It thus agreed to confer a benefit and suffer a prejudice which afforded· consideration for defendant's promises to it. (Civ. Code, § 1605.)

■ By paragraph eleventh of the writing: "The rates which are enumerated on Schedule A and the volume guaranteed by Forwarder will be renegotiated monthly; but this renegotiation does not affect any provision set forth in this contract." Defendant argues that "it is clear that if no rate or volume guarantees were negotiated for a specific point, as none were negotiated for San Francisco after' January, 1947, plaintiff cannot recover for any damages purported (sic) caused by defendant's termination of the instant contract,

since, in effect, we have here a contract which was to be renegotiated monthly and no renegotiations having occurred no binding contract existed for subsequent months.''

We were impressed with this argument of counsel for appellant and made it the basis of our first opinion in this case in which we ordered the judgment reversed. On rehearing, however, we are convinced from an examination of the record that by reason of the conduct of counsel in the trial court this question is not open to the appellant on this appeal. It seems necessary to quote rather extensively from the reporter's transcript to make clear the position there taken by appellant's counsel. During the cross-examination of plaintiff's only witness the following occurred:

"Q. *They didn't enter into a new contract every month with you?* A. No.

"Q. *They just sent you a new sheet with the new rates on it, did they not?* A. That's right.

"Q. *And they asked you to select from those sheets the volume by weight you thought you would tender to them for the month, is that so?* A. That's right.

"Q. So the contract was signed November the 16th, (sic) and *that is the only contract you entered into——. . .*

"THE WITNESS: That was the rider which you call your supplemental month to month contract.

"MR. BURNS: Q. *Rider, yes, but not contract. Will you stipulate, Mr. Harkleroad, there was only one contract and it was entered into on November 15, 1946?* A. Well, there was a preliminary negotiation for the contract, which we have not raised any question on. So, with the exception of that.

"MR. HARKLEROAD: We will stipulate that the November 15, 1946 contract constitutes the only contract we are relying on, subject to the supplemental monthly statements. Is that satisfactory?

"MR. BURNS: Yes. I think it is the only contract you can rely on, because it is the only one you have sued for breach of. Q. So the testimony will be straight in the record, *there is only the one contract* and that sets forth the terms under which you agreed to act as freight forwarder, and those terms were substantially in accordance with your agreement with the Flying Tiger line? A. Yes.'' (Italics ours.)

In view of counsel's insistence that the November 15 contract was the only contract between the parties and that the parties did not enter into a new contract every month, his rejection of the suggestion of the witness that there was a

"supplemental month to month contract" and finally his express request for a stipulation, which he received, that "there was only one contract and it was entered into on November 15, 1946" appellant is bound by the theory of the case, not only consented to but persistently insisted upon by its counsel at the trial. It is elementary law in the appellate procedure of this state that "the theory upon which a case is tried in the court below must be adhered to on appeal." (2 Cal. Jur. 237.)

■ The contention that plaintiff cannot in any event recover because its operations were illegal under the Civil Aeronautics Act was not urged in the trial court and depends on questions of fact which are raised for the first time on appeal. For this reason we will not consider that question. (*Levitt* v. *Glenn L. Clark & Co.*, 91 Cal.App.2d 662 [205 P.2d 747]; *Svistunoff* v. *Svistunoff*, 94 Cal.App.2d 651 [211 P.2d 352]; *Gelb* v. *Benjamin*, 78 Cal.App.2d 881 [178 P.2d 476]; *Grimes* v. *Nicholson*, 71 Cal.App.2d 538 [162 P.2d 934].)

Damages were awarded by the court for the following items in the following amounts: Sales literature, tariffs, placards, notices to the trade and calling cards, office stationery, invoices and envelopes containing reference to defendant as the carrier of the freight, rendered valueless by defendant's action—$378.40; advertising as defendant's forwarder in newspapers and trade journals, likewise rendered valueless—$500; anticipated gross profit lost—$2,500; expenses of operation subsequent to breach while plaintiff was unable to earn revenue—$2,750; purchase of new stationery eliminating reference to defendant—$345; cost of advertising and notices to trade with reference to cessation of operations through defendant—$175; loss of good will—$3,000.

■ It is obvious that plaintiff should not recover $2,500 for loss of anticipated gross profit and $2,750 for expenses of operation of the business during the period when that gross profit would have been received. The loss of gross profit is a proper item of damage since plaintiffs are out of pocket that amount through the defendant's breach, but their expenses of operating the business would as well have continued if the contract had not been breached. ■ It is equally clear that while loss of stationery, etc., bearing reference to defendant as the carrier is a direct damage caused by the breach, plaintiff cannot have both the cost of stationery rendered useless and the cost of stationery to replace it. It must have stationery if it continues in business whether it represents defendant or

some other carrier. The items of $2,750 cost of operation and $345 for new stationery, totalling $3,095, should not have been allowed.

Appellant attacks the allowance of any damage except loss of net profit, citing section 3358 Civil Code: "no person can recover a greater amount in damages for the breach of an obligation than he could have gained by the full performance thereof on both sides." The primary measure for breach of contract is section 3300 Civil Code: "For the breach of an obligation arising from contract, the measure of damages . . . is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

The two sections must be read together. As a result of the breach plaintiff is out of pocket $2,500 anticipated gross profit, $3,000 loss of good will, $500 advertising rendered valueless, $378.40 stationery, etc., rendered valueless and $175 necessarily expended in advertising the cessation of its business as a forwarder for defendant. If the contract had been fully performed plaintiff would "have gained" (§ 3358) the value of all of these items. It would have gained $2,500 gross profit which would have offset its expense of operation by that amount; it would have gained the useful value of the advertising and stationery, etc., which were rendered valueless; it would have gained the benefit of its good will which was damaged to the extent of $3,000; and it would have gained the $175 which it was compelled to expend in advertising that it no longer represented defendant. (*Cf. Henderson* v. *Oakes-Waterman, Builders,* 44 Cal.App.2d 615 [112 P.2d 662].)

The Supreme Court said in *Zinn* v. *Ex-Cell-O Corp.,* 24 Cal. 2d 290, 297-298 [149 P.2d 177]: "One whose wrongful conduct has rendered difficult the ascertainment of damages cannot escape liability because the damages could not be measured with exactness."

Future profits and the value of the good will of a recently established business which has not yet begun to operate at a net profit may be difficult to estimate. The difficulty is not of plaintiff's, but of defendant's making. " 'In determining the amount of damages . . . the jury was entitled to estimate as best they could from the evidence before them . . . the good will. . . . Undoubtedly, in cases like this, entire accuracy is impossible, and some difficulty is encountered in accurately assessing the damages . . . but it must not be forgotten that

such difficulty would have been avoided had appellant taken care that no occasion should arise through his tort requiring such assessing of damages.' '' (*Johnson* v. *Snyder*, 99 Cal. App.2d 86, 89-90 [221 P.2d 164], quoting from *Schuler* v. *Bordelon*, 78 Cal.App.2d 581, 586 [177 P.2d 959].)

We conclude that the judgment should be reduced from $6,628.40 to $3,533.40. The judgment is so modified and as modified is affirmed; each party to bear its own costs on appeal.

Nourse, P. J., and Goodell, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 9, 1951. Schauer, J., voted for a hearing.