127 Cal.App.2d Supp. 807 (1954)
REUBEN AGRAN, Respondent,
v.
MORRIS SHAPIRO et al., Appellants.
California Court of Appeals. 
June 14, 1954.
 Walter I. Colby for Appellants.
 Garrett H. Elmore as Amicus Curiae on behalf of Appellants.
 Byron Schwartz for Respondent.
 Loeb & Loeb as Amici Curiae on behalf of Respondent.
 PATROSSO, J.
 Plaintiff instituted this action to recover the sum of $2,000 for what his complaint denominates as "accounting services" rendered to the defendants, and from a resulting judgment in favor of the plaintiff for the amount sued for, defendants appeal. [127 Cal.App.2d Supp. 809]
 Plaintiff is a certified public accountant practicing his profession in the city of Los Angeles, and admitted to practice as an agent before the Treasury Department of the United States. He is not, however, a member of the bar, and the question presented is whether the services in question or some portion thereof constitute the practice of law and for which he is not entitled to recover. The evidence discloses that in 1948 plaintiff was retained by the defendants as an accountant and auditor for a corporation, Motor Sales of California, Inc., which was owned or controlled by them, and also for the preparation of defendants' individual income tax returns. We are not concerned with the services rendered by plaintiff to the corporation, but only with those performed for the defendants as individuals. These consisted of the preparation of their federal income tax returns for each of the years 1947 to 1950, inclusive, as well as their estimated return for 1951 and other services related thereto as hereinafter set forth.
 In the preparation of the joint return of the defendants for the calendar year 1948 plaintiff claimed as a deduction a loss in the sum of $43,260.56, which was incurred in this manner: defendants were the owners of a building in the city of Los Angeles which, under date of July 19, 1946, they had leased to one Pritchard, a dealer in used automobiles, for a fixed rental of $1,500 per month, plus 5 per cent of the net profits from lessee's operations in the demised premises. This lease, on November 5, 1947, was amended or superseded by a new agreement under which the rental to be paid was $1,500 per month, plus 5 per cent of the profits from lessee's operations upon the demised premises, as well as the profits derived from four other used-car lots operated by the lessee at other locations, in consideration of which defendants agreed with the lessee that they would, and did, guarantee the Bank of America against loss upon all "used cars financed by and contracts discounted with the "bank by the lessee." As part of this agreement the defendants agreed to, and did, deposit with the bank the sum of $115,000 in cash to secure their guaranty. The lessee thereafter became financially embarrassed, with the result that on December 14, 1947, the bank foreclosed against the lessee, and defendants' deposit was retained by it to cover any losses which it might sustain as the result of the bank's transactions with the lessee, and as of December 31, 1948, the bank had charged defendants' deposit with losses totalling the sum of $43,260.56, the amount claimed as a deduction in the 1948 return, as previously stated. [127 Cal.App.2d Supp. 810]"
 Following the preparation by plaintiff of the defendants' 1948 return, the exact date not appearing, plaintiff prepared and filed on behalf of each defendant a separate "application for tentative carry back adjustment" (Internal Revenue Code, 3780, 26 U.S.C.A. Cum. Pocket Part, p. 265) of the excess loss shown by the 1948 return ($29,074.83) to the two preceding years, 1946 and 1947. The allowance of the adjustment requested in this application, if granted by the Commissioner of Internal Revenue, would have the effect of extinguishing defendants' tax liability for the years 1946 and 1947 and as a result each of the defendants would be entitled to a refund (which they therein claimed) of the taxes paid for said preceding two years, in the total sum of $1,804.65. While the record is somewhat obscure on this point, it appears inferentially at least that such applications were granted and each of the defendants received a refund in the amount stated.
 For the preparation of the 1947 return plaintiff charged and was paid the sum of $30. Plaintiff, however, submitted no statement to the defendants for the preparation of the returns for the years subsequent to 1947 except insofar as a charge for such services may be included in the bill which he submitted to the defendants under date of March 31, 1952, to which reference will hereinafter be made. In explanation of this plaintiff testified that early in 1949 he advised the defendants "that he could not state what his fee at that time would be because as a matter of ordinary practice in the Bureau of Internal Revenue all tentative tax refund claims and income tax returns related thereto would be audited and investigated within three years from the date thereof by a revenue agent from said bureau, and therefore plaintiff would not be able to fix his accounting fee now but would charge defendants at a later date for the time and work involved in preparing said tax returns, refund claim, subsequent returns related thereto and in conferring and discussing said problem regarding this net operating business loss with revenue agent, and also would base said fee on any tax savings accomplished thereby." It does not appear that plaintiff performed any services in connection with income tax matters for the defendants other than as stated, and seemingly no "problem" arose in connection with any of the previous returns until August, 1951, at which time he received a call from Mr. Manson, a treasury agent, in regard to the 1949 return, in which there had been claimed as a deduction the unused portion [127 Cal.App.2d Supp. 811] ($7,776.01) of the Pritchard loss sustained, as hereinbefore stated, in 1948. Several meetings were held between plaintiff and Mr. Manson, in the course of which the latter stated that the so-called Pritchard loss did not qualify as a "net operating loss" and that as a result in recomputing the returns for 1946 to 1949, inclusive, the defendants were subject to an additional assessment in the sum of $15,000. Plaintiff disputed this contention of Mr. Manson, countering with the claim that the loss was a "net operating loss" which could be "carried back" and "that tax benefits and refunds could be secured for the years 1946 through 1950." Plaintiff further testified that in his several conferences with Mr. Manson he "cited him numerous cases" and "spent five days in the county law library and in his office reading tax services, cases, reports and decisions." Again he testified that "he spent approximately four days in reading and reviewing over one hundred cases on the proposition of law involved." As a final result of the conferences between himself and plaintiff, Mr. Manson stated that he would submit a report recommending an additional assessment of $6,280, and such report was thereafter filed by him. At a later date another treasury agent, Mr. Stewart, was assigned to the case, with whom plaintiff met upon at least one occasion and had at least two telephone conferences. Following these conferences plaintiff was advised by Mr. Stewart that he was in agreement with plaintiff's contention but that he "wanted to talk to the defendant once more"; Mr. Stewart further stating that the assessment would be reduced from $6,280 as recommended by Mr. Manson to $200, which latter amount would be assessed because of certain errors in the return unrelated to the matter of the loss in question. Some time later, in January or February, 1952, plaintiff was advised by Mr. Shapiro that he no longer needed plaintiff's services, and at the same time was advised that Mr. Shapiro had signed an agreement with Mr. Stewart closing the matter. Following this, and under date of March 31, 1952, plaintiff submitted a bill to the defendants in the sum of $2,000 which reads as follows:
 "To Professional Services Rendered:--"
 "Conferences with revenue agent Edgar Manson re his examination of the income tax returns of Morris and Helen Shapiro for the years 1946, 1947, 1948 and 1949."
 "Research of the problems involved and preparation of [127 Cal.App.2d Supp. 812] arguments to overcome the following proposed assessments of income tax:"
 [Tabular Material Omitted]
 "Conference with conferee James A. Stewart and subsequent discussion of the questions involved by telephone, resulting in a reversal of all disputed items contained in revenue agent Manson's report."
 "Report submitted by conferee James A. Stewart resulted in a tax saving in excess of $6,000.00 and was cleared to the Collector of Internal Revenue on February 5, 1952."
 [Tabular Material Omitted]
 [1] While courts have experienced difficulty in formulating a precise and all-embracing definition as to what constitutes the practice of law, the one generally accepted is that announced in Eley v. Miller, 7 Ind.App. 529, 535 [34 N.E. 836, 837], and adopted by our Supreme Court in People v. Merchants Protective Corp. (1922), 189 Cal. 531, 535 [209 P. 363, 365], as follows: "as the term is generally understood, the practice of law is the doing and performing services in a court of justice in any matter depending therein throughout its various stages and in conformity with the adopted rules of procedure. But in a larger sense it includes legal advice and counsel and the preparation of legal instruments and contracts by which legal rights are secured although such matter may or may not be depending in court." (Emphasis added.) See also People v. California Protective Corp. (1926), 76 Cal.App. 354, 359 [244 P. 1089, 1091]; People v. Ring (1937), 26 Cal.App.2d Supp. 768, 771 [70 P. 2d 281, 283]; People v. Sipper (1943), 61 Cal.App.2d Supp. 844, 846 [142 P.2d 960, 962]. However, whether a particular activity falls within this general definition is frequently a question of considerable difficulty, and particularly is this true in the field of taxation where questions of law and accounting are frequently inextricably intermingled as a result of which doubt arises as to where the functions of one profession end and those of the other begin. Specifically, whether practice before an administrative tribunal in tax matters constitutes the practice of law has been the subject of decisions elsewhere which appear to be in some conflict. (See cases collected in note 111 A.L.R. 32, 36, and authorities cited in Lowell Bar Assn. v. Loeb, [127 Cal.App.2d Supp. 813] (1943), 315 Mass. 176, 183 [52 N.E.2d 27, 33].) The question, under the circumstances here, is a particularly perplexing one, and we acknowledge the aid and assistance which has been afforded us in our efforts to resolve it by the excellent briefs filed by counsel as amici curiae on behalf of The State Bar of California and the California Society of Certified Public Accountants, respectively.
 It appears to be generally conceded that it is within the proper function of a public accountant, although not a member of the bar, to prepare federal income tax returns, except perhaps in those instances where substantial questions of law arise which may competently be determined only by a lawyer. In the case at hand we find no real difficulty in concluding that in the preparation of the income tax returns in question plaintiff did not engage in the practice of law. They are of such a simple character that an ordinary layman without legal or accounting training might have prepared them in the first instance. An inspection thereof discloses that the defendants had but three sources of taxable income: Mr. Shapiro's salary, the rental received from the building leased to Mr. Pritchard, and the rental from a two-flat building, one-half of which was occupied by the defendants as their residence, with the exception of the year 1950 in which the defendants in addition received interest from savings and loan associations in the total sum of $612.68. Likewise the deductions claimed therein, other than the portion of the Pritchard loss carried forward into the 1949 return were usual and ordinary expenses incident to the ownership and operation of income producing real property, the determination of the propriety of which required no particular legal knowledge.
 A different and more serious question arises, however, with respect to the services rendered by the plaintiff in preparing the applications for a carry back adjustment and refund of taxes paid for the previous two years, and the preparation of the 1949 return wherein a deduction was claimed for a portion of the Pritchard loss, as well as his subsequent services in resisting the additional assessment proposed by the Treasury Department upon the ground that the Pritchard loss did not constitute a "net operating loss" within the meaning of the "carry back" provisions of the statute. At this stage no question of accounting was involved. Neither the fact that the loss had been sustained nor the manner in which it arose was questioned. [2] The only question was whether, under the admitted facts, the loss was one which could be "carried [127 Cal.App.2d Supp. 814] back," the answer to which depended upon whether or not it was a loss "attributable to the operation of a trade or business regularly carried on by the taxpayer" within the meaning of that phrase as used in the Internal Revenue Code, section 122(d)(5). We see no escape from the conclusion that under the circumstances this question was purely one of law. A substantially similar question was presented in Wilson v. Eisner (C.Cal.App.2d, 1922), 282 F. 38, and the court, at page 41 says: "The question presented was whether the plaintiff was engaged in this enterprise as a business for profit or for pleasure. We think that on this proof, no question of fact was presented for submission to the jury. The undisputed proof made it a question of law for the court. Was the plaintiff carrying on a business within the meaning of the taxing act?" and continuing, on page 42, the court said: "Since the facts and circumstances are admitted or undisputed, the question of whether plaintiff was engaged in business for profit or pleasure became one for the court to decide, and it was error to leave the question of law to the determination of a jury ..." (See also Bingham's Trust v. Commissioner of Int. Rev., 325 U.S. 365, 370 [65 S.Ct. 1232, 89 L.Ed. 1670, 1675]; 163 A.L.R. 1175, 1180.) And in Commissioner of Int. Rev. v. Smith (U.S.C.A. 2 Cir., 1953), 203 F.2d 310, 311, rev. 17 T.C. 135, 142, cert. den., 346 U.S. 816 [74 S.Ct. 27, 98 L.Ed. 343]), the court said: "Whether a particular loss or expense is incurred in a taxpayer's trade or business is a question of fact in each particular case. Higgins v. Commissioner of Int. Rev., 312 U.S. 212 [61 S.Ct. 475, 85 L.Ed. 783]; Treas. Reg. 111, sec. 29.23 (k)-6. But insofar as this determination involves interpretation of the statutory language, it raises an issue of law on which the Tax Court's decision is subject to review here. Washburn v. Commissioner of Int. Rev., 8 Cir., 51 F.2d 949, 951."
 Not only was the question which arose here one of law but a difficult and doubtful one as well, as evidenced by the many occasions upon which the courts and the Treasury Department have had occasion to consider it. (See annotations in 26 U.S.C.A., to 23(e), 23(s), and 122; also extensive note to Lazier v. United States, 170 F.2d 521 [9 A.L.R.2d 324]; and compare Conrades v. Commissioner of Int. Rev. (1930), 21 B.T.A. 213.) Moreover, it is evident that the plaintiff himself fully appreciated this. He not only testified that "in his opinion it was a tough case because it was an isolated one" but he detailed at length the extensive research of the [127 Cal.App.2d Supp. 815] legal authorities which he was required to make in order to support his position that the loss was one which qualified as a "net operating loss" under a proper interpretation of the statutory definition.
 Both parties place reliance upon the decision in the Matter of New York County Lawyers Assn. (1948), 273 App.Div. 524 [78 N.Y.S.2d 209, 9 A.L.R.2d 787], commonly referred to as the Bercu case, which was affirmed without opinion in 299 N.Y. 728 [87 N.E.2d 451]. There one Bercu, an accountant, not a member of the bar, was consulted by a corporation [which kept its books upon an accrual basis] as to whether or not certain sales taxes accrued but not paid in a preceding year could be deducted in the income tax return for a subsequent year. Thereafter he rendered an opinion to the effect that such taxes might be deducted in the year of their payment, for which services he submitted a bill for $500. This not being paid, he instituted suit in the municipal court and was denied recovery upon the ground that the services for which he sought payment constituted the practice of law. Thereafter the reported proceeding was instituted by the Lawyers' Association to have him adjudged guilty of contempt of court and to enjoin him from similar activities in the future. The court held that in undertaking to render an opinion upon the point in question Mr. Bercu was unlawfully undertaking to practice law. However, the court seems to have been influenced in reaching the conclusion which it did largely by reason of the fact that Mr. Bercu had not previously performed any accounting work for the corporation, nor was the advice given in connection wtih the preparation by him of an income tax return for the corporation. It must be admitted that, as contended by plaintiff here, the language of the opinion suggests that if Bercu had been the accountant of the corporation or engaged to prepare its income tax return, he might have advised it as he did in his opinion without subjecting himself to the charge of practicing law in so doing. In the course of the opinion it said (78 N.Y.S.2d 220 [9 A.L.R.2d 796]): "Respondent is most persuasive when he challenges the consistency of recognizing an accountant's right to prepare income tax returns while denying him the right to give income tax advice. As respondent says, precisely the same question may at one time arise during the preparation of an income tax return and at another time serve as the subject of a request for advice by a client. The difference is that in the one case the accountant is dealing [127 Cal.App.2d Supp. 816] with a question of law which is only incidental to preparing a tax return and in the other case he is addressing himself to a question of law alone."
 Thus it would appear that the New York court adopts, as the criterion for determining whether advice relative to tax matters constitutes the practice of law, whether or not it is given as an incident to accounting work or in the preparation of tax returns. While for reasons hereinafter stated we are not prepared to accept the view to its fullest extent, we do not believe that the court necessarily entertained the view that, as plaintiff here contends, having prepared the return, an accountant who is not a member of the bar may thereafter undertake to advise his client with respect to difficult or doubtful legal questions arising therefrom or undertake to seek a refund, the right to which depends wholly upon the interpretation of the taxing statutes. No such question was there presented, and we are not prepared to accept the decision as holding that a nonlawyer may properly perform services such as those last enumerated.
 We believe, however, that the criterion formulated by the New York court for determining whether a particular activity does or does not constitute the practice of law is unsatisfactory for the reasons well stated by the Supreme Court of Minnesota in Gardner v. Conway (1951), 234 Minn. 468 [48 N.W.2d 788]. There a nonlawyer had undertaken to prepare a federal income tax return which necessarily involved the determination by him of various questions of law. By reason of this a proceeding in contempt and to restrain him from similar practice in the future was instituted against him, and he defended upon the ground that, while the preparation of the tax return involved the determination of legal questions, this did not constitute the practice of law because the resolving of such questions was but incidental to the preparation of the return which was an act that any layman might perform. From the report of the case it appears that in its consideration the court had the benefit of amici curiae briefs filed by the Minnesota Association of Public Accountants, National Society of Public Accountants, Minnesota Society of Public Accountants, American Institute of Accountants, Minnesota State Bar Association and the American Bar Association. In the course of an elaborate opinion, after pointing out the necessity, despite the difficulty involved, of establishing some criterion for distinguishing "that which is from that which is not law practice," the court said (234 [127 Cal.App.2d Supp. 817] Minn. 479, [48 N.W.2d 795]): "If we bear in mind that any choice of criterion must find its ultimate justification in the interest of the public and not in that of advantage for either lawyer or nonlawyer, we soon cease to look for an answer in any rule of thumb such as that based upon a distinction between the incidental and the primary. See People v. Title Guarantee & Trust Co., 227 N.Y. 366, 379 [125 N.E. 666, 670]; Merrick v. American Security & Trust Co., 107 F.2d 271 [71 App.D.C. 72]. Any rule which holds that a layman who prepares legal papers or furnishes other services of a legal nature is not practicing law when such services are incidental to another business or profession completely ignores the public welfare. A service performed by one individual for another, even though it be incidental to some other occupation, may entail a difficult question of law which requires a determination by a trained legal mind. See 33 Minnesota Law Review 445. Are we to say that a real estate broker who examines an abstract of title and furnishes an opinion thereon may not be held to practice law because the examination of a title is ancillary to a sale and purchase of real estate? ... The incidental test has no value except in the negative sense that if the furnishing of the legal service is the primary business of the actor such activity is the practice of law, even though such service is of an elementary nature. In other words, a layman's legal service activities are the practice of law unless they are incidental to his regular calling; but the mere fact that they are incidental is by no means decisive. In a positive sense, the incidental test ignores the interest of the public as the controlling determinant."
 "In rejecting the incidental test, it follows that the distinction between law practice and that which is not may be determined only from a consideration of the nature of the acts of service performed in each case. No difficulty arises where such service is the primary business of the actor. We then have law practice. Difficulty comes, however, when the service furnished is incidental to the performance of other service of a nonlegal character in the pursuit of another calling such as that of accounting. In the field of income taxation, as in the instant case, we have an overlapping of both law and accounting. An accountant must adapt his accounting skill to the requirements of tax law, and therefore he must have a workable knowledge of law as applied to his field. By the same token, a lawyer must have some understanding of accounting. In the income tax area, they occupy much common [127 Cal.App.2d Supp. 818] ground where the skills of both professions may be required and where it is difficult to draw a precise line to separate their respective functions. The public interest does not permit an obliteration of all lines of demarcation. We cannot escape reality by hiding behind a facade of nomenclature and assume that 'taxation,' though composed of both law and accounting, is something sui generis and apart from the law. See Matter of New York County Lawyers Ass'n (Bercu), 273 App.Div. 524 [78 N.Y.S.2d 209, 9 A.L.R.2d 787], affirmed 299 N.Y. 728 [87 N.E.2d 451]. If taxation is a hybrid of law and accounting, it does not follow that it is so wholly without the law that its legal activities may be pursued without proper qualifications and without court supervision. The interest of the public is not protected by the narrow specialization of an individual who lacks the perspective and the orientation which comes only from a thorough knowledge and understanding of basic legal concepts, of legal processes, and of the interrelation of the law in all its branches. Generally speaking, whenever, as incidental to another transaction or calling, a layman, as part of his regular course of conduct, resolves legal questions for another--at the latter's request and for a consideration--by giving him advice or by taking action for and in his behalf, he is practicing law if difficult or doubtful legal questions are involved which, to safeguard the public, reasonably demand the application of a trained legal mind. What is a difficult or doubtful question of law is not to be measured by the comprehension of a trained legal mind, but by the understanding thereof which is possessed by a reasonably intelligent layman who is reasonably familiar with similar transactions. A criterion which designates the determination of a difficult or complex question of law as law practice, and the application of an elementary or simple legal principle as not, may indeed be criticized for uncertainty if a rule of thumb is sought which can be applied with mechanical precision to all cases. Any rule of law which purports to reflect the needs of the public welfare in a changing society, by reason of its essential and inherent flexibility, will, however, be as variable in operation as the particular facts to which it is applied."
 We are confirmed in our conclusion that the activities of the plaintiff which we have detailed fall within the domain of the lawyer by a consideration of The Statement of Principles Relating to Practice in the Field of Federal Income Taxation, which was recommended by the National Conference of Lawyers and Certified Public Accountants and approved by The [127 Cal.App.2d Supp. 819] Council of the American Institute of Accountants May 8, 1951, wherein it is stated (pars. 3, 6, 8): "3. Ascertainment of probable tax effects of transactions. ... The ascertainment of probable tax effects of transactions frequently is within the function of either a certified public accountant or a lawyer. However, in many instances, problems arise which require the attention of a member of one or the other profession, or members of both. When such ascertainment raises uncertainties as to the interpretation of law (both tax law and general law), or uncertainties as to the application of law to the transaction involved, the certified public accountant should advise the taxpayer to enlist the services of a lawyer. When such ascertainment involves difficult questions of classifying and summarizing the transaction in a significant manner and in terms of money, or interpreting the financial results thereof, the lawyer should advise the taxpayer to enlist the services of a certified public accountant. ..."
 "6. Representation of taxpayers before Treasury Department. Under Treasury Department regulations lawyers and certified public accountants are authorized, upon a showing of their professional status, and subject to certain limitations as defined in the Treasury Rules, to represent taxpayers in proceedings before that Department. If, in the course of such proceedings, questions arise involving the application of legal principles, a lawyer should be retained, and if, in the course of such proceedings accounting questions arise, a certified public accountant should be retained. ..."
 "8. Claims for refund. ... Claims for refund may be prepared by lawyers or certified public accountants, provided, however, that where a controversial legal issue is involved or where the claim is to be made the basis of litigation, the services of a lawyer should be obtained." (37 A.B.A.J., 517, 536-537; 76 Am.Bar Assn.Rep. 699, 700-701.)
 From what has been said, it appears that plaintiff undertook to determine the "tax effect" of defendant's transaction with Pritchard, the ascertainment of which involved uncertainties both as to the interpretation of the taxing statute as well as the application thereof to the transaction in question. It is likewise evident from the plaintiff's testimony that at the time of preparing the application for carry back adjustment and refund he realized that a "controversial legal issue" was involved with respect to which the Treasury Department might take a contrary view, for he assigned this as a reason why he could not then advise defendants as to what his fee [127 Cal.App.2d Supp. 820] in the matter would be. And when he finally submits his bill we find that, in detailing therein the services covered thereby, no mention is made of accounting work or that involved in the preparation of the returns, but rather he describes the same as consisting of "conferences with revenue agent(s)" and "research of the problems involved and preparation of arguments to overcome" the proposed additional assessments, the only basis for which could be the Treasury Department's claim that the Pritchard loss did not constitute a "net operating loss" under section 122. Surely the solution of this "problem" did not involve or depend upon the application of accounting principles or procedure, but of legal principles and precedents. These were the subject of plaintiff's "research" and these alone could serve as the foundation for his "arguments" addressed to the representatives of the Treasury Department in resisting the "proposed assessments."
 From what has been said, we would have but little hesitancy in concluding that the services rendered by plaintiff other than those involved in the preparation of the income tax returns and possibly others of an accounting character constitute the practice of law as that term has been judicially defined in this state. (Kountz v. Rowlands (1943), 46 Pa. D.& C.Rep. 461, 463.) The more serious questions which present themselves, however, are (1) whether the controlling test of what constitutes the practice of law in the field of federal income taxation is dictated by federal legislation, congressional or administrative, and (2) the effect of the federal regulations which have been adopted in this field. Upon behalf of the plaintiff, it is urged by amicus curiae that an affirmative answer is required to the first inquiry and that, inasmuch as plaintiff was enrolled as an agent in the Treasury Department, and by virtue thereof licensed to practice before that department, all of his activities in the instant case were within the scope of such license, and any action by a state court which would interfere with or curtail the right so granted is not only unwarranted but unconstitutional.
 [3] By the Act of July 7, 1884, section 3 (23 Stats. 258), Secretary of the Treasury is authorized to prescribe "regulations governing the recognition of agents ... representing claimants before his Department ..." Pursuant to this statutory authority, the secretary issued Circular 230 (now parts 10 and 13, subtit. A, tit. 31, Code Fed. Reg.), which insofar as material here reads as follows: "An agent enrolled before the Treasury Department shall have the same [127 Cal.App.2d Supp. 821] rights, powers and privileges and be subject to the same duties as an enrolled attorney: Provided, that an enrolled agent shall not have the privilege of drafting or preparing any written instrument by which title to real or personal property may be conveyed or transferred for the purpose of affecting Federal taxes, nor shall such enrolled agent advise a client as to the legal sufficiency of such an instrument or its legal effect upon the Federal taxes of such client; And provided further, That nothing in the regulations in this part shall be construed as authorizing persons not members of the bar to practice law." (Code Fed. Reg., 10.2(f), tit. 31, subtit. A, part 10.)
 "Practice before the Treasury Department shall be deemed to comprehend all matters connected with the presentation of a client's interests to the Treasury Department, including the preparation and filing of necessary written documents, and correspondence with the Treasury Department relative to such interests. Unless otherwise stated, the term 'Treasury Department,' as used in this paragraph and elsewhere in this part, includes any division, branch, bureau, office, or unit of the Treasury Department, whether in Washington or in the field, and any officer or employee of any such division, branch, bureau, office or unit." (Id., 10.2(b).)
 In this connection also, reference should be made to Rule 2 of the former United States Board of Tax Appeals, now Tax Court of the United States (26 U.S.C.A. Int. Rev. Code, p. 604, following 5011), for the admission to practice, after examination, of citizens without restriction to members of the bar or certified public accountants, and the validity of such rule has been recognized. (Goldsmith v. United States Board of Tax Appeals (1926), 270 U.S. 117 [46 S.Ct. 215, 70 L.Ed. 494, 496]; Crane-Johnson Co. v. Commissioner of Int. Rev. (8 C.C.A. 1939), 105 F.2d 740, 744.) In the latter case, however, the court expressly stated that it did not undertake "to determine the question as to whether the appearance before the Board (of Tax Appeals) by a certified public accountant constituted the unlawful practice of law in the District of Columbia." With this particular question, however, we are not here concerned.
 No case which we have been able to discover has undertaken to directly decide the precise question with which we are confronted, namely, whether the Treasury regulations referred to have the effect of declaring that services performed by an enrolled agent in connection with federal income [127 Cal.App.2d Supp. 822] tax matters do not constitute the practice of law in the sense that such practice is prohibited, by state law, when engaged in by other than members of the bar. We direct our attention, however, to such as have been cited as having more or less a bearing upon the question.
 The first is Brooks v. Mandel-Witte Co. (2 C.C.A. 1932), 54 F.2d 992. There the defendant, an importing concern, entered into a contract with one Stern, a customs house broker--not a member of the bar--to make, file and prosecute protests and appeals, and "to retain counsel" at his (Stern's) expense, to secure the allowance of refunds of custom duties, upon a contingent fee of one-third of all amounts refunded. Pursuant to this contract, Stern engaged plaintiff, an attorney at law, to institute and prosecute the necessary proceedings in the United States Customs Court, upon an agreement to pay plaintiff a portion of his contingent fee. The proceedings resulted in the recovery of a substantial sum for the defendant, and the plaintiff, not having received payment of his fee, instituted suit to enforce an attorney's lien, as provided by the New York statute, against the fund. The defense interposed was two-fold: (1) that, inasmuch as, under the rules of the Customs Court, admission to the bar was not required as a prerequisite to practice therein, the services rendered by plaintiff were not legal, and hence no lien existed; and (2) that if the services rendered by plaintiff constituted the practice of law, he was barred from recovery by virtue of a statute of the state which made it unlawful for one "to make it a business to solicit employment for a lawyer, or to furnish attorneys or counsel or an attorney and counsel to render legal services ... without having been first duly and regularly licensed and admitted to practice law in the courts of record of the state." The majority held (1) that although the services rendered by plaintiff were such as, under the rules of the Customs Court, might lawfully be performed by a layman, the plaintiff nonetheless was entitled to an "attorney's lien," and (2) that the statute referred to, which prohibited laymen from soliciting employment for a lawyer or furnishing an attorney to render legal services, was inapplicable because the Customs Court permitted custom house brokers to practice and appear before it. It was in connection with this last holding that the majority used the language relied upon by plaintiff, that "The state statute could not prohibit this" (practice by laymen before that court). Not only does Byrne v. Kansas City etc. Ry Co., [127 Cal.App.2d Supp. 823] 55 F. 44, cited in support of this statement, fail to sustain it, but the incongruity of the reasoning employed and the result reached by the majority is evident and is tersely pointed out in one sentence by Judge Learned Hand in his dissent. He says (p. 996): "Either the services were not those of an attorney at law, and there was no lien; or the agreement was unlawful, and there was no pay." Under the circumstances, we attach little weight to this case.
 More closely in point and supporting plaintiff's position is De Pass v. B. Harris Wool Co. (1940), 346 Mo. 1038 [144 S.W.2d 146], wherein plaintiff, a nonlawyer licensed to practice before the Interstate Commerce Commission, sought to recover for services rendered before that body in certain rate reduction cases on behalf of the defendant. Defendant demurred upon the ground that the alleged contract called for services which, under the law of Missouri, constituted the practice of law, and hence plaintiff was barred from recovery. The Supreme Court of Missouri, though apparently of the view that, judged by Missouri law, the services in question constituted the practice of law, held that the question was foreclosed by the Rules of Practice of the Interstate Commerce Commission (49 U.S.C.A. Appendix following 1185, p. 448), which permitted laymen licensed by it to practice before it. Says the court (p. 148): "Defendant seems to argue that the right to define the practice of law and to regulate persons engaging in such practice falls within the police power of the state. So it does, except in so far as that right does not run contra to an Act 'made in pursuance' to the Federal constitution."
 It does not appear, however, that the rule of the Interstate Commission there involved contained any limitation with respect to the practice of law as does the Treasury regulation under consideration.
 In re Lyon (1938), 301 Mass. 30 [16 N.E.2d 74], cited on behalf of plaintiff, and relied upon in De Pass v. B. Harris Wool Co., just considered by us, is, we believe, factually distinguishable. Moreover, it must be viewed in the light of the discussion in the more recent decision of the same court--Lowell Bar Assn. v. Loeb (1943), 215 Mass. 176 [52 N.E.2d 27], wherein the court adverted to but did not undertake to determine the effect of the Treasury regulations previously referred to. The court there said (p. 33 [52 N.E.2d]): "Neither do we consider at this time whether the permission granted to certified public accountants and other persons not [127 Cal.App.2d Supp. 824] members of the bar to practice in tax matters by the rules of the United States Treasury Department and of the administrative tribunal (Helvering v. Rankin, 295 U.S. 123, 131 [55 S.Ct. 732, 79 L.Ed. 1343]; Huggins v. Commissioner of Int. Rev., 312 U.S. 212 [61 S.Ct. 475, 85 L.Ed. 783]) now called the Tax Court of the United States, can have the effect of granting by implication to holders of 'Treasury enrollment cards' a right to perform in this Commonwealth services in connection with Federal taxes which in their nature are comprised in the practice of law. It may deserve consideration whether the rules of a Federal administrative tribunal can legalize acts done in the States in matters not actually before the tribunal, though of a class that might eventually come before it. Matter of Lyon, 301 Mass. 30, 34-36 [16 N.E.2d 74]; De Pass v. B. Harris Wool Co., 346 Mo. 1038 [144 S.W.2d 146]."
 Were we convinced that the effect of the Treasury Regulations is to declare that acts constituting the practice of law in the accepted sense could lawfully be performed by non-members of the bar, we would entertain the same doubts as those suggested by the Supreme Judicial Court of Massachusetts in the portion of the opinion quoted above. (Cf. Chicago Bar Assn. v. United Taxpayers of America (1941), 312 Ill.App. 243 [38 N.E.2d 349], holding the rule of Department of Finance permitting nonlawyers to appear before it in behalf of taxpayers void insofar as it purported to authorize such to perform acts constituting practice of law.) We do not, however, believe that the regulations in question were intended to or have the effect contended for on behalf of plaintiff. We regard as highly significant the concluding clause in section 10.2(f) "that nothing in the regulations in this part shall be construed as authorizing persons not members of the Bar to practice law." This statement must be read in context with the opening sentence of the section providing that "An agent enrolled before the Treasury Department shall have the same rights, powers and privileges ... as an enrolled attorney" and as qualifying the same. As admittedly the Treasury Department is without authority to prescribe the rights and privileges to be exercised by persons except those appearing before it upon behalf of others, this provision could only have been intended as a disavowal of any intent upon the part of the Secretary of the Treasury to confer authority upon enrolled agents, not members of the bar, to perform acts upon behalf of others in connection with [127 Cal.App.2d Supp. 825] matters before the department which would otherwise constitute the practice of law. We cannot subscribe to the argument advanced upon behalf of the plaintiff that this provision was merely "a catch-all clause designed to prevent enrolled agents from holding themselves out as general attorneys" and "to limit the authority granted an enrolled agent to the precise field of Federal income taxation." Rather it suggests a recognition that "practice before the Treasury Department," while it may include acts which do not constitute the practice of law, and hence within the authority of enrolled agents, though not lawyers, to perform, also comprehends others of such character as to bring them within this classification. (See Petition of Kearney (Fla., 1953), 63 So.2d 630.
 In essence plaintiff's contention is that the effect of the Treasury regulations is to declare that an enrolled agent, though not a lawyer, may, in the representation of others in tax matters before the Treasury Department, lawfully perform all of the services which a member of the bar is authorized to perform except "the privilege of drafting or preparing any written instrument by which title to real or personal property may be conveyed or transferred for the purpose of affecting Federal taxes" or advising "a client as to the legal sufficiency of such an instrument or its legal effect upon the Federal taxes of such client." If this be true, we see no reason for the concluding proviso in 10.2(f), disavowing any intent to thereby authorize nonlawyers to perform acts in connection with tax matters before the Department which would constitute the practice of law.
 Yet another consideration confirms us in the conclusion we have reached. We refer to the Statement of Principles previously adverted to which were approved by the American Institute of Accountants, wherein it is recognized that representation before the Treasury Department may involve the "application of legal principles" necessitating the retention of a lawyer. We can hardly believe that, if the conferees representing the certified public accountants who joined in recommending the adoption of the Statement and the Members of the Council of the American Institute of Accountants who approved it, were of the view that the effect of the Treasury regulations authorized an enrolled agent who was not a lawyer to perform any and all services on behalf of others before the Treasury Department that might be performed [127 Cal.App.2d Supp. 826] by a lawyer, they would have given their adherence thereto.
 Thus we conclude that, as indicated, the judgment in favor of plaintiff includes an award for services which constituted the practice of law, for which, not being a member of the bar, he was not entitled to recover.
 It but remains to consider the additional contention of the plaintiff that defendants may not rely upon the defense of illegality by reason of the fact that it was not specially pleaded in their answer. We do not agree. Section 6125, Business and Professions Code, provides that: "No person shall practice law in this State unless he is an active member of the State Bar" and section 6126 of the same code provides that any person practicing law who is not an active member of the State Bar is guilty of a misdemeanor. [4] It is elementary that a contract, express or implied, the performance of which necessarily involves a violation of a penal statute, may not give rise to a cause of action. (12 Cal.Jur.2d p. 274, 72, and cases there cited.) [5] It is equally well settled that if the question of illegality develops during the course of a trial, a court must consider it whether pleaded or not, "and when a court discovers a fact which indicates that the contract involved is illegal and ought not to be enforced, it will, on its own motion, instigate an inquiry in relation thereto ... Whenever the evidence discloses the relations of the parties to the transaction to be illegal and against public policy, it becomes the duty of the court to refuse to entertain the action. Whether the evidence comes from one side or the other, in the absence of a pleaded and proved exception to the general rule, the disclosure is fatal to the case, and the court is justified in rendering judgment that neither party take anything from the other." (12 Cal.Jur.2d, p. 306, 106.)
 In Fewel & Dawes, Inc. v. Pratt (1941), 17 Cal.2d 85 [109 P.2d 650], the Supreme Court says (p. 92): "Defendant in his answer denied any liability under the contract. He introduced evidence at the trial showing that Fewel was at no time a licensed agent or broker. He moved in the trial court to vacate the judgment and to have judgment entered in his favor on the ground that the contract was illegal and hence unenforceable. In his brief on appeal he urged the illegality of the contract as grounds for reversal. There is therefore no basis for precluding him from raising the question of illegality on appeal. If the contract is illegal [127 Cal.App.2d Supp. 827] as a matter of law, this court may refuse to enforce it regardless of the pleadings of the parties. (Morey v. Paladini, 187 Cal. 727 [203 P. 760]; Pacific Wharf etc. Co. v. Standard Am. Dredging Co., 184 Cal. 21 [192 P. 847]; Endicott v. Rosenthal, 216 Cal. 721 [16 P.2d 673]; Kreamer v. Earl, 91 Cal. 112 [27 P. 735]; Dean v. McNerney, 91 Cal.App. 206 [266 P. 975]; 6 Cal.Jur. 162; 4 Cal.Jur.Supp. 71, 72.)" Here plaintiff alleged that he rendered "accounting services" to the defendants, and this allegation was denied in the answer, thus raising an issue as to the nature or character of the services for which plaintiff sought recovery.
 The authorities relied upon by the plaintiff as supporting a contrary rule are not in point. In Gelb v. Benjamin (1947), 78 Cal.App.2d 881 [178 P.2d 476], not only was illegality not pleaded by the evidence failed to disclose that the contract sued upon was violative of law. The same is true of Levitt v. Glen L. Clark & Co. (1949), 91 Cal.App.2d 662 [205 P.2d 747], and Phalanx Air Freight, Inc. v. National etc. Freight Corp (1951), 104 Cal.App.2d 771 [232 P.2d 510]. In Meyer v. El Tejon Oil & Ref. Co. (1946), 29 Cal.2d 184 [174 P.2d 1], the question of illegality was not involved.
 The fact therefore that defendants did not plead the defense of illegality cannot be the means whereby plaintiff is permitted to recover for performing services involving a violation of a penal statute. [6] When upon the trial it was made to appear that plaintiff was not an active member of the State Bar and his testimony disclosed that certain of the services for which he sought recovery constituted the practice of law, it become the imperative duty of the court to deny plaintiff any recovery therefor.
 In concluding this opinion, we cannot refrain from offering the comment that this case serves to demonstrate the desirability of legislation which would permit this court to certify questions of first impression and great importance, such as those here presented, to the highest court of the state for ultimate determination. Inasmuch, however, as a federal constitutional question is here presented, the avenue is open to a review by the Supreme Court of the United States.
 The judgment is reversed, and the cause remanded for a new trial in accordance with the views herein expressed.
 Shaw, P. J., concurred.
 BISHOP, J.
 I concur, not only in the judgment, but with most all that is said in the opinion. I do not agree with the [127 Cal.App.2d Supp. 828] criticism of the Bercu case (Matter of New York County Lawyers Assn. (1948), 273 App.Div. 524 [78 N.Y.S.2d 209, 9 A.L.R.2d 787]) in Gardner v. Conway (1951), 234 Minn. 468 [48 N.W.2d 788]. Neither case furnishes a standard that fits all situations. I am agreed, however, that some of the services for which the plaintiff made his charge must be characterized as legal services, and the consequence is that the judgment was for too large a sum.